[L.A. No. 31889. Dec. 5, 1985.]

FRED DRYER, Plaintiff and Respondent, v.
LOS ANGELES RAMS et al., Defendants and Appellants.

COUNSEL

Wyman, Bautzer, Rothman, Kuchel & Silbert, Terry Christensen and J. Jay
Rakow for Defendants and Appellants.

Farella, Braun & Martel, Willkie, Farr & Gallagher and Stephen E. Cone
as Amici Curiae on behalf of Defendants and Appellants.

Gage & Mazursky, Sanford M. Gage and John M. Thomas for Plaintiff and
Respondent.

---

OPINION

KAUS, J.*—Defendant Los Angeles Rams (Rams) and individual code-
fendants appeal from an order of the Los Angeles Superior Court denying
their petition to compel arbitration. Basing its ruling on *Graham* v. *Scissor-
Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165], the
trial court held that the arbitration procedure established by the National
Football League (NFL) collective bargaining agreement fails to satisfy the
requisite "minimum levels of integrity" and is therefore unenforceable. We
conclude that the petition to compel arbitration should have been granted.
Not only is the *Graham* analysis incompatible with federal law governing
in this case, but—in the context of this dispute—the NFL arbitration pro-
cedure does not violate the *Graham* standards.

I

Background

On April 1, 1980, plaintiff Fred Dryer and the Rams entered into an
employment contract—a slightly modified version of the standard NFL play-
er contract drafted pursuant to a collective bargaining agreement between
the players' union and the NFL management. Alleging that the Rams re-
moved him from the active roster in violation of his contract,[1] Dryer sued
in superior court. The Rams responded with a petition to compel arbitration.

Dryer's contract contains a standard provision calling for binding arbitra-
tion under the terms of the applicable collective bargaining agreement in

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chair-
person of the Judicial Council.

[1]Although he was removed from the active roster, Dryer's contract was not terminated
and he continued to receive his full salary.

the event of a dispute involving interpretation or application of any provision of the contract. Article VII of the applicable collective bargaining agreement sets forth a grievance and arbitration procedure for general contract disputes. Replete with the full panoply of due process safeguards—notice, representation, hearing, appeal to outside arbitrators, etc.—this basic arbitration machinery appears to be unobjectionable.

What the trial court did find offensive was a clause in article VII which provides that matters which are filed as grievances and which involve "the integrity of, or public confidence in, the game of professional football" may be ordered withdrawn from the article VII procedure by the commissioner—after consultation with the player-club relations committee—and processed under article VIII (Commissioner Discipline).[2] Once removed from the article VII grievance procedure, such matters are handled exclusively by the NFL commissioner, who hears both the dispute and any appeal arising from his own decision. The NFL commissioner is appointed and paid by the management of the member clubs.

### The Superior Court's Opinion

The trial court denied defendants' petition to compel arbitration. Finding that the arbitration clause of the contract (i.e., arts. VII and VIII of the collective bargaining agreement) is a contract of adhesion, the court further held that the contract is "unconscionable" in that it fails to meet the "minimum levels of integrity" standard required by *Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807. This holding rests on the court's conclusion that under the collective bargaining agreement "all arbitration decisions can ultimately be vested in the League Commissioner at his discretion."

With regard to a possible federal preemption problem, the trial court did find that the collective bargaining agreement affects interstate commerce and is therefore subject to section 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)). The court determined, however, that applicable federal and state principles are compatible.

---

[2]NFL Collective Bargaining Agreement, article VII, section 8: "In the event a matter filed as a grievance in accordance with the provisions of Section 3 above gives rise to issues involving the integrity of, or public confidence in, *the game of professional football,* the Commissioner may, at any stage of its processing, *after consultation with the PCRC, order that the matter be withdrawn from such processing* and thereafter be processed in accordance with the procedure provided in Article VIII . . . ." (Original italics.)

Article VIII of the agreement provides that ". . . all disputes involving a fine or suspension imposed upon a player by the Commissioner for conduct on the playing field, or involving action taken against the player by the Commissioner for conduct detrimental to the integrity of or public confidence in, the game of professional football, will be processed exclusively [under this Article]."

Finally, the court denied the petition to compel arbitration as to all defendants other than the Rams on the rationale that the individual defendants were not signatories to the contract.

## II

■ Dryer's dispute with the Rams—centering on a provision of the NFL collective bargaining agreement—clearly falls within the ambit of section 301(a) of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a)), which pertains to "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . ."[3] This answers the threshold question of what law applies in this case, for it is firmly established that federal substantive law governs the validity and enforcement of contracts under the LMRA. (*Republic Steel* v. *Maddox* (1965) 379 U.S. 650, 657 [13 L.Ed.2d 580, 585, 85 S.Ct. 614]; *Textile Workers* v. *Lincoln Mills* (1957) 353 U.S. 448, 456 [1 L.Ed.2d 972, 980, 77 S.Ct. 912].) Specifically, federal law governs the enforcement of arbitration provisions in contracts involving interstate commerce (*Southland Corp.* v. *Keating* (1984) 465 U.S. 1 [79 L.Ed.2d 1, 104 S.Ct. 852]), and section 301(a) authorizes enforcement of a promise to arbitrate in a collective bargaining agreement. (*International Ass'n of Mach. & A. Wkrs.* v. *General Elec. Co.* (2d Cir. 1969) 406 F.2d 1046, 1050.)

■ Thus, while our jurisdiction over this suit is concurrent with that of the federal judiciary,[4] federal law remains applicable, and "incompatible doctrines of local law must give way." (*Teamsters Local* v. *Lucas Flour Co.* (1962) 369 U.S. 95, 102 [7 L.Ed.2d 593, 598, 82 S.Ct. 571]; *Textile*

---

[3]It is settled that the NFL is engaged in interstate commerce. (*Radovich* v. *Nat. Football League* (1957) 352 U.S. 445, 452 [1 L.Ed.2d 456, 461, 77 S.Ct. 390] [federal antitrust laws applicable]; *Partee* v. *San Diego Chargers Football Co.* (1983) 34 Cal.3d 378, 383 [194 Cal.Rptr. 367, 668 P.2d 674].)

Section 301 applies even though the union is not an actual signatory to the contract between Dryer and the Rams. The contract expressly incorporates by reference the arbitration provisions of the applicable NFL collective bargaining agreement. For purposes of determining the applicability of section 301(a) to an individual contract dispute, the question is whether the rights, remedies or benefits at issue are within the scope of the collective bargaining agreement. (See *Smith* v. *Evening News Ass'n* (1962) 371 U.S. 195, 200 [9 L.Ed.2d 246, 251, 83 S.Ct. 267]; *Rehmar* v. *Smith* (9th Cir. 1976) 555 F.2d 1362, 1366-1367.) The United States Supreme Court articulated succinctly the rationale behind the broad coverage of section 301: "Individual claims lie at the heart of the grievance and arbitration machinery, are to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based. To exclude these claims from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." (*Smith* v. *Evening News Assn., supra,* 371 U.S. at p. 200 [9 L.Ed.2d at p. 251].)

[4]*Dowd Box Co.* v. *Courtney* (1962) 368 U.S. 502 [7 L.Ed.2d 483, 82 S.Ct. 519].

*Workers, supra,* at p. 457 [1 L.Ed.2d at p. 980]; *Rehmar* v. *Smith* (9th Cir. 1976) 555 F.2d 1362, 1368; *Charles Rounds Co.* v. *Joint Council of Teamsters* (1971) 4 Cal.3d 888 [95 Cal.Rptr. 53, 484 P.2d 1397].) We may look to state law for guidance, but only if it effectuates the policies underlying federal labor legislation. (*Seymour* v. *Hull & Moreland Engineering* (9th Cir. 1979) 605 F.2d 1105, 1109.)

After determining correctly that the NFL collective bargaining agreement is indeed subject to section 301(a) of the LMRA, the trial court expressed the view that "there is no incompatibility between federal and state principles as applied to this case." It then went on to apply principles of unconscionability and of adhesive contracts as embodied in *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 632 P.2d 165].

Our review of federal policy and case law strongly suggests that the principles of *Graham*—applied in the context of a motion to compel arbitration under a provision of a collective bargaining agreement subject to section 301(a)—are incompatible with federal law and national labor policy. To effectuate that policy, federal law appears to limit a court's inquiry to a few basic questions concerning arbitrability of the dispute and defenses, if any, based on allegations of a lack of fair representation. We find no federal precedent for a *Graham*-type inquiry into the fairness of the arbitration machinery itself as part of the court's role in considering a motion to compel arbitration under a bona fide collective bargaining agreement.

■ National labor policy favors arbitration. Indeed, Congress has specifically encouraged labor and management to negotiate private means of dispute resolution: "Final adjustment by a method agreed upon by the parties is declared to be the desirable method of settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." (LMRA, § 203(d) (29 U.S.C. § 173(d) [1978]).) Courts can best serve this policy by giving full effect to the means chosen by the parties for settlement of their differences under a collective bargaining agreement. (*Steelworkers* v. *American Mfg. Co.* (1960) 363 U.S. 564, 566 [4 L.Ed.2d 1403, 1405, 80 S.Ct. 1343]; *Brannon* v. *Warn Bros., Inc.* (9th Cir. 1974) 508 F.2d 115, 119; *Grunwald-Marx, Inc.* v. *L.A. Joint Bd.* (1959) 52 Cal.2d 568, 581 [343 P.2d 23].)

The United States Supreme Court has observed that state decisions contrary to this policy of full enforcement could have a "crippling effect" on grievance arbitration. (*Steelworkers* v. *American Mfg. Co., supra, id.;* see also, *Republic Steel* v. *Maddox, supra,* 379 U.S. at p. 653 [13 L.Ed.2d at p. 583].) ■ Normally, a claim that the contract grievance procedures are unfair or inadequate cannot be asserted until the aggrieved party has

attempted to implement the procedures and found them to be unfair. (*Republic Steel, supra.*) "A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. [In addition to weakening the union's status in collective bargaining], it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievance. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.'" (*Republic Steel, supra,* 379 U.S. at p. 653 [13 L.Ed.2d at pp. 583-584], quoting *Teamsters Local* v. *Lucas Flour Co., supra,* 369 U.S. at p. 103 [7 L.Ed.2d at p. 599].)

■ The judicial role in considering a motion to compel arbitration is thus quite limited. Indeed, the Ninth Circuit has noted that a district court's function is essentially ended "once it has found the collective bargaining agreement susceptible of an interpretation which would cover the dispute. . . ." (*International Ass'n of Machinists* v. *Howmet Corp.* (9th Cir. 1972) 466 F.2d 1249, 1256; see also, *Jacksonville News. Print. P. U. No. 57* v. *Florida Pub. Co.* (5th Cir. 1972) 468 F.2d 824, cert. den. 411 U.S. 906 [36 L.Ed.2d 196, 93 S.Ct. 1531]; *Clanebach, Inc.* v. *Las Vegas Loc. Jt. Ex. Bd. of Cul. Wkrs. & Bar.* (9th Cir. 1968) 388 F.2d 766 [In action to compel arbitration, court's inquiry is limited to determining whether dispute is conceivably governed by the contract and whether the parties agreed to arbitrate it.].)

In this case, Dryer's claims all arise from the contract and are thus subject to the contract provision mandating arbitration of "[a]ny dispute between Player and Club involving the interpretation or application of any provision of this contract . . . ."[5]

Beyond the threshold determination of arbitrability of a dispute, a court may—consistent with federal law—consider the resisting party's allegations of breach of the duty of fair representation. Federal courts have held, for example, that an aggrieved employee may circumvent the arbitration procedures created in a collective bargaining agreement if the employee establishes that the union breached its duty of fair representation in processing the grievance. (*Hines* v. *Anchor Motor Freight* (1976) 424 U.S. 554, 563-

---

[5]Even if Dryer's dispute were not so clearly arbitrable under the language of the contract, doubts are to be resolved in favor of arbitrability, notwithstanding state contract doctrines to the contrary. See, e.g., *Alameda Room, Inc.* v. *Pitta* (S.D.N.Y. 1982) 538 F.Supp. 1072, 1077 (substantive state contract law on which employer relied in seeking stay of arbitration order on theory that the dispute was not governed by the collective bargaining agreement, was preempted by § 301(a)).

564 [47 L.Ed.2d 231, 240-241, 96 S.Ct. 1048]; *Poole* v. *Budd Co.* (6th Cir. 1983) 706 F.2d 181, 183.)[6] Dryer, however, has not shown a lack of fair representation. Rather, his argument concerns the inherent fairness of the arbitration machinery agreed upon by both union and management.

The limited role of the courts in this area has been underscored repeatedly by decisions to the effect that an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute and that all doubts are to be resolved in favor of coverage. (*Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574, 582-583 [4 L.Ed.2d 1409, 1417-1418, 80 S.Ct. 1347, 1353]; *Haig Berberian, Inc.* v. *Cannery Warehousemen* (9th Cir. 1976) 535 F.2d 496, 499; *Brannon* v. *Warn Bros., Inc., supra,* 508 F.2d at p. 119; *International Ass'n of Machinists* v. *Howmet, supra,* 466 F.2d at p. 1256; *Howard Elec. Co.* v. *International Bro. of E. Loc. U. No. 570* (9th Cir. 1970) 423 F.2d 164, 166.) Federal case law, however, in no way suggests that a court may deny a motion to compel arbitration on the basis of a *Graham*-type analysis of the arbitration procedure itself. In fact, courts generally order arbitration despite objections concerning the arbitration procedures. For example, it is immaterial to a company's duty to arbitrate that the grievance procedure agreed to in the collective bargaining agreement is employee-oriented. (*Monongahela Pow. Co.* v. *Loc. No. 2332 Int. Bro. of El. Wkrs.* (4th Cir. 1973) 484 F.2d 1209, 1214; see *Avco Corp.* v. *Local No. 787* (3d Cir. 1972) 459 F.2d 968, 970.) Mere inequality of bargaining power between a union and an employer does not constitute unfairness which will permit either party to avoid a collective bargaining agreement. (*Lewis* v. *Quality Coal Corp.* (7th Cir. 1959) 270 F.2d 140, 143, cert. den. 361 U.S. 929 [4 L.Ed.2d 353, 80 S.Ct. 369].) Also, under federal law, partisan arbitrators are generally permissible. (*ATSA of Calif., Inc.* v. *Continental Ins. Co.* (9th Cir. 1983) 702 F.2d 172, 175.)

In short, when deciding whether to compel or deny arbitration, federal courts confine their inquiry to a few threshold issues; they do not consider the substance of the grieving party's claims, nor do they scrutinize the agreed-upon arbitration procedures for general fairness.[7] Thus, although

[6]See also *Nuest* v. *Westinghouse Air Brake Company* (S.D.Ill. 1970) 313 F.Supp. 1228 (the union's duty of fair representation protects the individual employee from arbitrary abuses of the settlement procedure, and, if an abuse occurs, the proper mode of redress is in the context of allegations of lack of fair representation).

[7]The few isolated cases wherein arbitration was denied because of "fairness" concerns are wholly inapplicable here. In *Watson* v. *Cudahy Co.* (D.C.Colo. 1970) 315 F.Supp. 1286, for example, the court refused to order arbitration of a dispute between employees and the union involving certain continuous service bumping rights claimed by employees, despite the general pro-arbitration policy: the reason was, however, that union and management were on the same side against a small group of individual employees, rather than being on opposing sides, and the arbitrator had been selected by agreement of union and management.

federal law does not expressly preclude the exercise of state powers with regard to arbitration procedures, we believe that to apply the reasoning of *Graham* in this context would frustrate rather than further the goals of national labor policy.[8] After resolving the threshold question of arbitrability, the trial court should compel arbitration under the collective bargaining agreement—without regard to the possibility that the arbitration machinery might run afoul of the *Graham* standards.

### III

 Federal law aside, we independently hold that arbitration should have been ordered in this case. The trial court concluded that the arbitration provisions failed to meet "minimum levels of integrity" required by *Graham* solely because of the remote—indeed, speculative—possibility of commissioner intervention. However, neither the holding nor the reasoning of *Graham* dictates this result. *Graham* held, in relevant part, that "arbitration provisions which designate as sole arbitrator either an affected contractual party or one with identical interests in the outcome of the dispute fail to achieve the level of basic integrity which we require of a contractually structured substitute for formal judicial proceedings." (28 Cal.3d 807, 831.) Moreover, if the party resisting arbitration can show that the rules under which arbitration is to proceed will deprive it of a fair procedure, then the agreement to arbitrate will not be enforced. (*Id.,* at p. 826.)

 Assuming, arguendo, that the *Graham* standards could apply at all to the NFL collective bargaining agreement,[9] the trial court still

---

[8] In another context, we noted that federal labor legislation fostering collective bargaining could not be read to preempt state legislative efforts to prescribe minimum standards of wages, hours, and working conditions for the protection of employees. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 727 [166 Cal.Rptr. 331, 613 P.2d 579].) State governmental entities retain broad authority to establish minimum standards related generally to the "welfare" of employees. (*Id.,* at p. 728.) Nonetheless, as the foregoing review of federal law suggests, inquiry into the fairness of an arbitration procedure agreed to in a bona fide collective bargaining agreement does not appear to be consistent with the letter or spirit of federal law. Nor is such an inquiry—as part of a court's consideration of a motion to compel arbitration—a traditional exercise of the states' police powers. (See, e.g., *De Canas* v. *Bica* (1976) 424 U.S. 351, 356 [47 L.Ed.2d 43, 49, 96 S.Ct. 933]; *Terminal Ass'n* v. *Trainmen* (1943) 318 U.S. 1, 6-7 [87 L.Ed. 571, 577-578, 63 S.Ct. 420] [discussing worker welfare matters subject to state regulation].)

[9] It is not necessary for us to reach the question of whether the arbitration provisions of the NFL collective bargaining agreement constitute a contract of adhesion or whether the doctrine of adhesion can even be applied to bona fide collective bargaining agreements. We note that such agreements are not "ordinary contracts" and are not " ' "governed by the same old common-law concepts which control . . . private contracts," but are "unique in character and a field unto themselves." ' " (*Carpenters 46 Northern Cal. Counties Conf. Bd.* v. *Valentine* (1982) 131 Cal.App.3d 534, 541 [182 Cal.Rptr. 500].) There is apparently no precedent for applying the doctrine of adhesion to true collective bargaining agreements.

erred in its analysis. Under the agreement's normal arbitration procedure—article VII—a grievance goes to the player-club relations committee, which is composed of two representatives from the players' union and two from the management council. If the disputants so desire, they may stipulate to bypass this stage and submit the matter directly to an outside arbitrator. Any resolution of a grievance by mutual agreement or by majority vote of the player-club relations committee must be reduced to a writing which sets forth the specific reasons for the resolution, after which it constitutes a full and binding disposition of the dispute. Should the committee fail to resolve the grievance within five days of the hearing, either party may appeal to an outside arbitrator selected upon mutual agreement of the union and management.

The provision for commissioner intervention which the court found unconscionable exists only as a contingent procedure in a narrowly circumscribed category of disciplinary matters. It applies only to disputes over "a fine or suspension imposed upon a player by the Commissioner [for] conduct on the playing field, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of or public confidence in, the game of professional football. . . ." (NFL collective bargaining agreement, art. VIII, § 1.)[10] Dryer's case is a contract dispute—not a disciplinary matter—and there is no indication that the intervention provision ever could be or would be invoked.[11]

---

Indeed, the concept of adhesion seems inconsistent with the substantive legal requirement—enforced through an arm of the federal government—that parties to a collective bargaining agreement must negotiate with one another in good faith.

Moreover, as we noted in *Graham,* "a contract of adhesion is fully enforceable according to its terms" unless it violates the weaker party's reasonable expectations or is unduly oppressive or unconscionable. (28 Cal.3d at p. 819.) Clearly, courts may enforce reasonable and fair arbitration provisions contained in contracts of adhesion. (See, e.g., *Parr v. Superior Court* (1983) 139 Cal.App.3d 440 [188 Cal.Rptr. 801]; *Painters Dist. Council No. 33 v. Moen* (1982) 128 Cal.App.3d 1032 [181 Cal.Rptr. 17].) As indicated by our analysis of the arbitration procedure in this case, we do not believe that this arbitration process would violate the *Graham* standard even if the doctrine of adhesion did apply.

[10]Our reading of this provision in the NFL collective bargaining agreement is reinforced by the standard player contract signed by Dryer, which indicates the kinds of conduct which are deemed to affect the "integrity" of the sport: ". . . Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the [League] or professional football, the Commissioner will have the right . . . to fine Player in a reasonable amount; to suspend Player for a period certain. . . ."

[11]Indeed, in order to facilitate arbitration, the Rams offered to stipulate that any order to arbitrate could be conditioned upon nonintervention by the commissioner. The Rams also offered to submit this dispute directly to outside arbitration. Given the facts of this case, we need not determine the effect of these offers.

*Graham* confronted this court with an entirely different scenario. There, a concert promoter and a performer union member had entered into a standard union contract containing an arbitration clause which provided that disputes would be submitted to the executive board of the union itself. Upon petition, the lower court ordered arbitration. Without a hearing, the executive board issued a decision fully supporting the performer. The promoter protested and was granted a hearing. However, the referee was a former executive officer and longtime member of the union, and the promoter's request to have the proceedings transcribed was denied. The referee also recommended an award in favor of the performer, which was affirmed by the same executive board. The performer then petitioned in superior court for confirmation of the award and judgment was entered accordingly. The promoter appealed.

In *Graham,* the promoter was faced with an arbitration procedure in which the decision makers were allied with the union and which offered no form of appeal outside of the union: ". . . the 'minimum levels of integrity' which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment—especially where, as here, the arrangement is the product of circumstances indicative of adhesion." (28 Cal.3d at p. 827.)

In fashioning a remedy, we acknowledged the strong public policy in favor of resolving disputes by arbitration. Accordingly, we ruled that upon remand the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing that, the court should—upon petition of either party—appoint the arbitrator. (28 Cal.3d at p. 831.)

In the present case, the trial court invalidated an entire arbitration procedure because of a purely speculative possibility that the commissioner might have the power, at some point, to withdraw the dispute from the normal arbitration process. Of course, if the commissioner had stepped in or if there existed any reasonable basis in law upon which he might step in, we would have a different case, one in which *Graham* might be controlling. Similarly, the arbitration procedure might fail to meet the "minimum levels of integrity" required by *Graham* if it could be shown that the possibility of commissioner intervention exerts a substantial "chilling effect" on the entire arbitration process. However, given the facts of this case and narrow range of cases in which the intervention provision could be invoked, the trial court's invalidation of the entire NFL arbitration machinery was unwarranted—especially in light of the strong public policy favoring arbitration.

## IV

The trial court also held that the individual defendants are not entitled to the benefit of arbitration because they are not parties to the contract between Dryer and the Rams. Given the facts and the procedural posture of this case, this ruling yields bizarre results.

In his complaint, Dryer specifically alleges that three of the four individual defendants are being sued in their capacities as "the owners, operators, managing agents, and in control [*sic*] of a Professional Football Team, associated franchise properties, and assets, doing business under the name of the Los Angeles Rams." Elsewhere in the complaint, he states that each— that is, presumably, all four—of the individual defendants is a party to the contract and that each defendant breached the contract. Moreover, the trial court specifically found that each cause of action alleged in the complaint is included in and governed by the contract.

■ ■ ■ ■ If it is true that all of the significant issues in this suit arise out of the contract or the alleged breach of contract,[12] and if the trial court correctly concluded that the individual defendants are not parties to the contract (presumably because they were not signatories), then it is not clear that these defendants belong in this suit at all. ■ If, as the complaint alleges, the individual defendants, though not signatories, were acting as agents for the Rams, then they are entitled to the benefit of the arbitration provisions. (*Berman* v. *Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1004 [119 Cal.Rptr. 130].) Thus, our conclusion that this entire dispute be referred to arbitration applies to the individual defendants as well as to the Rams.

For the foregoing reasons, the order is reversed. The trial court is directed to grant the petition to compel arbitration with respect to all defendants.

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I agree with the majority's conclusion that *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171

---

[12]The trial court was correct in its ruling that all of the claims raised in the complaint are governed by the contract, notwithstanding the fact that many of the causes of action are framed in tort. A long line of California and federal cases holds that claims framed in tort are subject to contractual arbitration provisions when they arise out of the contractual relationship between the parties. (*Hope* v. *Superior Court* (1981) 122 Cal.App.3d 147 [175 Cal.Rptr. 851]; *Lewsadder* v. *Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255 [111 Cal.Rptr. 405]; *Altshul Stern & Co.* v. *Mitsui Bussan Kaisha, Ltd.* (2d Cir. 1967) 385 F.2d 158.)

Cal.Rptr. 604, 623 P.2d 165] does not permit this court to invalidate an otherwise acceptable arbitration procedure on the "purely speculative possibility" that the commissioner will intervene. (Maj. opn., *ante,* at p. 417.) I also join their decision to reserve judgment on whether *Graham* would control if the commissioner were reasonably likely to intervene, or if it were shown that the possibility of intervention distorted the arbitration process. (*Ibid.*)

I part company with their conclusion that section 301(a) of the federal Labor Management Relations Act (29 U.S.C. § 185(a)) forbids this court even to undertake a *Graham* inquiry. (Maj. opn., *ante,* part II.) *Graham* itself found otherwise. (28 Cal.3d at pp. 830-831.) Nothing in the majority opinion persuades me that *Graham* was wrong on this score.

Here, this court is asked to review an arbitration procedure which appears to be fair at least as applied. The procedure is the result of a collective bargaining agreement. Under these circumstances, it is easy to forget that there may be arbitration procedures which, though contained in negotiated union contracts and governed by section 301(a) (see maj. opn., *ante,* at pp. 410-411), nonetheless "essentially preclude the possibility of a fair hearing." (*Graham, supra,* 28 Cal.3d at p. 826, fn. 23.) I would urge my colleagues not to jump to the conclusion that in all circumstances federal law will require us to enforce such agreements.

*Graham* reviewed the arbitration provisions of a union contract under which a union official would decide disputes between union members and employers. The decision was normally made without hearing, and no appeal to a neutral arbiter was available. (*Graham, supra,* 28 Cal.3d at pp. 814-815.) In *Graham,* this court held that such procedures fell below "minimum levels of integrity" (*id.,* at p. 828) and denied the nonunion party "the common law right of fair procedure" (*id.,* at p. 826). The court went on to consider whether federal law nonetheless required enforcement of the arbitration agreement, since the action was arguably governed by section 301(a).

*Graham* found that federal law did not require this result. "[W]e decline to find . . . that the substantive federal law of collective bargaining agreements requires any result different from that which we have reached. Until that law, in its application to circumstances such as that before us, is further elaborated by the federal courts, we assume that it does not differ significantly from our own. [Citation.] We have held today, as a matter of state law and policy, that arbitration provisions which designate as sole arbitrator either an affected contractual party or one with identical interests in the outcome of the dispute fail to achieve the level of basic integrity which we

require of a contractually structured substitute for formal judicial proceedings. The fact that the instant case arises in the context of what may be considered a labor dispute should not, in our view, render this rule any the less applicable." (*Id.,* at pp. 830-831.)

Today's majority reverse this holding of *Graham.* Yet in so doing, they fail to cite any federal case law which compels such a result. Since there appears to be none, I would affirm *Graham*'s holding.

The majority cite cases which articulate "the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." (*Teamsters Local* v. *Lucas Flour Co.* (1962) 369 U.S. 95, 105 [7 L.Ed.2d 593, 600, 82 S.Ct. 571].) (Maj. opn., *ante,* at pp. 412-413.) But these cases are not persuasive authority for the specific proposition that unconscionable, illusory arbitration procedures must under all circumstances be enforced.

Most of the cases, as the majority acknowledge, concern the scope of coverage, not the fairness, of arbitration agreements. (See, e.g., *Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574, 583 [4 L.Ed.2d 1409, 1417, 80 S.Ct. 1347] [contracting-out grievances must be submitted to arbitration since they were not "necessarily excepted" from it]; *Republic Steel* v. *Maddox* (1965) 379 U.S. 650 [13 L.Ed.2d 580, 85 S.Ct. 614] [contract grievance procedures must be exhausted by discharged employee seeking severance pay]; *Haig Berberian, Inc.* v. *Cannery Warehousemen* (9th Cir. 1976) 535 F.2d 496 [dispute as to whether employees at new plant are covered by collective bargaining agreement is arbitrable]; *Brannon* v. *Warn Bros., Inc.* (9th Cir. 1974) 508 F.2d 115, 119-120 [questions of finality of grievance procedure, and of what constitutes adequate notice of grievance hearing, are arbitrable]; *Jacksonville Newspaper Printing Pressmen and Assistants' Union No. 57* v. *Florida Pub. Co.* (5th Cir. 1972) 468 F.2d 824, cert. den. 411 U.S. 906 [36 L.Ed.2d 196, 93 S.Ct. 1531] [arbitration clauses embrace disputes concerning contractual provisions for composition of arbitration panel, and disputes concerning contractual provisions barring arbitration if panel not selected in 30 days]; *International Ass'n. of Machinists* v. *Howmet Corp.* (9th Cir. 1972) 466 F.2d 1249 [issues arising from plant closure within scope of arbitration clause]; *Howard Elec. Co.* v. *International Bro. of E. W. Loc. U. No.* 576 (9th Cir. 1970) 423 F.2d 164 [whether union instigated or encouraged walkout is arbitrable]; *Clanebach, Inc.* v. *Las Vegas Loc. Jt. Ex. Bd. of Cul. Wkrs and Bartenders* (9th Cir. 1968) 388 F.2d 766 [whether a contract requires company to negotiate wage rates for certain classes of employees is arbitrable]. Maj. opn. *ante,* at pp. 413, 414.)

The cases cited for the rule that "employee-oriented" or "partisan" arbitration agreements are enforceable simply do not bear the weight which the majority place on them. *Monongahela Pow. Co.* v. *Loc. No. 2332 Int. Bro. of El. Wkrs.* (4th Cir. 1973) 484 F.2d 1209, 1214 and *Avco Corp.* v. *(UAW) Local No. 787* (3d Cir. 1972) 459 F.2d 968, 972 found "employee-oriented" arbitration procedures to be enforceable against management. However, those cases clearly used the term to mean that the grievance procedures were designed to be initiated by employees. Neither case involved, or even considered, arbitration by a less-than-impartial decision maker. (See also *Wilkes-Barre, etc.* v. *Newspaper Guild, etc.* (M.D.Pa. 1980) 504 F.Supp. 54, 71-72.) *ATSA of California, Inc.* v. *Continental Ins. Co.* (9th Cir. 1983) 702 F.2d 172, 175-176, amended (1985) 754 F.2d 1394, approved "partisan arbitrators" in sanctioning a contractual agreement to utilize a panel of two arbitrators appointed by the respective parties and one umpire. There was no suggestion that the panel as a whole was biased. *Lewis* v. *Quality Coal Corporation* (7th Cir. 1959) 270 F.2d 140, 143, cert. den. 361 U.S. 929 [4 L.Ed.2d 353, 80 S.Ct. 369], is inapposite. It simply held that an employer could not avoid contract provisions (there, a closed-shop agreement) by claiming that the contract was signed under threat of a lawful strike.

I cannot find any federal law which requires the enforcement of arbitration procedures which are so unfair as to come under the *Graham* holding. On the contrary, as six members of this court found in *Graham,* " 'Congress has put its blessing on private dispute settlement arrangements . . ., but it was anticipated, we are sure, that the contractual machinery would operate within some minimum levels of integrity.' (*Hines* v. *Anchor Motor Freight* (1976) 424 U.S. 554, 571 [47 L.Ed.2d 231, 245, 96 S.Ct. 1048].)" (*Graham, supra,* 28 Cal.3d at p. 825.)

The reason for the congressional blessing of arbitration agreements is the belief that they promote industrial peace. "The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware. . . . '. . . it is common knowledge in industrial relations circles that grievance arbitration often serves as a safety valve for troublesome complaints.' " (*Steelworkers* v. *American Mfg. Co.* (1960) 363 U.S. 564, 568 and fn. 6 [4 L.Ed.2d 143, 1407, 80 S.Ct. 1343], quoting Cox, *Current Problems in the Law of Grievance Arbitration* (1958) 30 Rocky Mt. L.Rev. 247, 261.)

"A collective bargaining agreement is an effort to erect a system of industrial self-government. . . . [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by mold-

ing a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant need and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." (*Steelworkers* v. *Warrior & Gulf Co., supra,* 363 U.S. at pp. 580-581 [4 L.Ed.2d at pp. 1416-1417].)

None of these goals can be achieved if the parties perceive the arbitration machinery as fundamentally biased. Federal labor policy cannot demand enforcement of an arbitration agreement which *Graham* would otherwise invalidate.

No one disputes that as a general proposition arbitration agreements must be enforced according to their terms. (Maj. opn., *ante,* at pp. 412-413.) Yet, federal courts have recognized that at times the machinery cannot operate fairly and, thus, cannot be enforced. " '[B]ecause these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.' [Citations.]" (*Vaca* v. *Sipes* (1967) 386 U.S. 171, 185 [17 L.Ed.2d 842, 854-855, 87 S.Ct. 903], quoted in *Glover* v. *St. Louis-S. F. R. Co.* (1969) 393 U.S. 324, 330 [21 L.Ed.2d 519, 524, 89 S.Ct. 548].)

In *Glover,* the high court had refused to compel arbitration where the persons who would decide a grievance were inescapably biased about it. *Glover* allowed a group of black employees to bypass arbitration and sue in federal court on a claim that the union and the company together were discriminating against them in job promotions. The wrongs the workers alleged constituted a violation of the collective bargaining agreement and it was conceded that they were arbitrable under that agreement. (*Id.,* at pp. 326-327 [21 L.Ed.2d at pp. 521-522].) Nonetheless, the high court found that the grievance and arbitration procedures administered jointly by the company and the union—the very entities charged with discrimination in breach of the contract—would be futile. Accordingly, demanding their exhaustion would not promote "the overall purposes of federal labor relations policy." (*Id.,* at p. 330 [21 L.Ed.2d at p. 524].)

Other cases have recognized that arbitration procedures may be avoided when they require a party to submit to a decision maker so biased as to be incapable of providing a fair hearing. *Steele* v. *L. & N. R. Co.* (1944) 323 U.S. 192 [89 L.Ed. 173, 65 S.Ct. 226], like *Glover,* held that black firemen need not appear for arbitration before a tribunal chosen by the union and

company charged with discrimination. "We cannot say that a hearing, if available, before [this] tribunal[] would constitute an adequate administrative remedy. Cf. *Tumey* v. *Ohio* [(1927)] 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437]." (*Steele, supra,* 323 U.S. at p. 206 [89 L.Ed. at p. 185]; see also *Watson* v. *Cudahy Company* (D.Colo. 1970) 315 F.Supp. 1286, 1287–1288 [employee need not submit to arbitration a dispute concerning which union and management agree on a position adverse to his; the hearing will be unfair in part because the arbitrator will be chosen by union and management, and "[t]he individual plaintiffs in this action had no choice in this selection, other than through their union representative, who is now their adversary."].)

It is to be hoped that arbitration machinery established through collective bargaining will seldom if ever run afoul of those "elementary requirements of impartiality taken for granted in every judicial proceeding[.]" (See *Commonwealth Corp.* v. *Casualty Co.* (1968) 393 U.S. 145 [21 L.Ed.2d 301, 89 S.Ct. 337].) Yet, such situations can be imagined. *Graham* is one example of a contract covered by section 301(a) which contains fundamentally unfair procedures. Perhaps, the provision for commissioner intervention in the present contract is another. *Glover* and *Steele* illustrate arbitration agreements which are fair on their face but unconscionable as applied. I fear the majority opinion sweeps so broadly that this court would henceforth be bound to enforce each of these contracts. I cannot agree that federal law requires us to do that.