Filed 7/29/14  Alston v. Hoge CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GERALD K. ALSTON,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>RONALD HOGE et al.,<br><br>        Defendants and Respondents. | A139778<br><br>(Alameda County<br>Super. Ct. No. RG10549562) |

Gerald K. Alston appeals from a judgment confirming an arbitration award rendered after he was compelled by court order to arbitrate his complaint against Glacier Bay, Inc. (GB) and respondents Ronald Hoge and Marc Hoffman.  Alston contends the trial court erred in ordering the matter to arbitration in the first instance.  We disagree, and affirm the judgment.

## I.  BACKGROUND

### A.  *The Arbitration Agreement*

Alston founded GB in 1990.  The company sold refrigeration systems and power generation control systems for use in a range of industries.  In 2006, Alston entered into an agreement with New Enterprise Associates (NEA), a private equity firm, to take an equity position in exchange for an investment to help build the company.  Both NEA and Alston received stock in GB under this arrangement.  Initially, Alston was chief executive officer (CEO) and NEA had Hoge take a seat on the board of directors.  Due to disagreements about the company's direction, Alston left the CEO position in 2007 and became GB's chief technology officer (CTO).  In February 2009, Alston resigned as

CTO and began to work on ideas for a new company.  He remained a shareholder of GB,[1] and continued to serve as a director on its board.

In March 2009, Alston entered into a "Transition and Consulting Agreement" (the Agreement) in conjunction with his resignation as CTO.  The Agreement touched upon a range of issues concerning the termination of Alston's employment and his future relationship with GB.  The parties agreed on the end date of Alston's employment relationship with GB and specified GB's remaining financial obligations to him as an employee, such as payment for his unused paid time off and business-related expenses.  Simultaneously, and in exchange for Alston's abiding by the terms of the Agreement and signing a release of claims against GB and "its officers, directors, agents, servants, employees," GB agreed to engage Alston to serve as a part-time consultant to GB (40 hours per month) for a 12-month period at a salary of $20,000 per month, plus certain other benefits, such as providing office space and health insurance premium reimbursement.  The release covered claims of any nature "arising out of or in any way related to events, acts or omissions occurring any time up to and including" the date Alston signed the Agreement, exclusive of his rights under the Agreement.

Alston further agreed not to "use, disclose or reproduce" GB's proprietary and confidential information, not to engage in a competing business, and not to disparage GB and its officers, directors, and employees.  The Agreement also expressly confirmed that Alston had ongoing, postemployment duties under an "Employee Confidentiality and Inventions Agreement" he had signed in 2006 (attached as exhibit B to the Agreement), including that GB had rights in any valuable intellectual property Alston conceived or developed through the use of company trade secrets, confidential information, equipment, or facilities, whether before or after his employment.

---

[1] As of 2009, Alston owned approximately 7 percent of GB's common stock, which was not publicly traded and was subject to some restrictions.  GB also had a large number of preferred shares outstanding.

The Agreement contained two other paragraphs the parties rely upon in this appeal:

"**4. Other Relationships/Agreements.** You are a stockholder of the Company and currently serve as a director on the Board of Directors of the Company (the 'Board'). *Except as expressly provided herein, nothing in this Agreement shall modify any rights, duties or obligations you have with respect to your status and roles as a stockholder or as a director of the Company or any written agreements with respect thereto*, including, without limitation [specifying various agreements and stock warrants restricting the sale of GB stock]."[2] (Italics added.)

"**13. Dispute Resolution.** To ensure rapid and economical resolution of any disputes regarding this Agreement, you and the Company hereby agree that *any and all claims, disputes or controversies of any nature whatsoever arising out of, or relating to, this Agreement, or its interpretation, enforcement, breach, performance or execution, your relationship with the Company, or the termination of any such relationship, shall be resolved, to the fullest extent permitted by law, by final, binding and confidential arbitration . . . .*" (Italics added.)

## B. *The Lawsuit*

Alston signed the Agreement on March 13, 2009. On September 3, 2010, GB terminated Alston as a director on the stated grounds Alston's new business pursuit was in competition with GB and violated his fiduciary duties as a director.[3] Alston sued respondents and GB in December 2010, alleging causes of action for (1) intentional misrepresentation (against all defendants), (2) negligent misrepresentation (all defendants), (3) declaratory relief (GB only), (4) commercial defamation (GB and

---

[2] Paragraph 5 of the Agreement does appear to modify Alston's rights under a "Stock Restriction Agreement" or at least to clarify their application in light of his changed status.

[3] Alston alleged in this lawsuit the stated reason was pretextual, and he was terminated as a director for seeking to expose financial fraud by respondents.

Hoffman), (5) interference with prospective economic advantage (GB and Hoffman), and (6) wrongful termination as director (GB only). He demanded a jury trial.

Alston's two misrepresentation causes of action alleged Hoge and Hoffman misrepresented GB's financial and marketing information to potential investors during 2008 through 2010, and created an elaborate scheme to inflate the company's sales numbers. He alleged he refrained from selling his stock in the company based at least in part on these representations, and sustained substantial losses to the value of the stock as a result.

Alston's third cause of action sought a declaratory judgment that GB had no ownership interest in intellectual property he alleged he developed after resigning his position as CTO, and that he had not violated his fiduciary duties as a GB director by pursuing his new company.

Alston's commercial defamation and interference with prospective economic advantage claims were premised on allegations that for the purpose of harming his reputation and with knowledge of his prospective economic relationships with certain potential customers of his new business, GB and Hoffman communicated false and derogatory statements to the customers, including that GB had title to his intellectual property and he was violating his fiduciary duties as a director of GB.

Alston's sixth cause of action for wrongful termination alleged GB terminated him as a director because of his reports of financial fraud within the company and repeated requests for an investigation.

## C. *Arbitration and Confirmation of the Award*

In reliance on paragraph 13 of the Agreement, respondents and GB petitioned to compel arbitration of Alston's complaint and to stay proceedings in the trial court. The trial court granted the petition, ordered all of Alston's claims to arbitration as provided in the Agreement, and stayed the action in its entirety pending the outcome of the arbitration.

In the arbitration proceeding, Alston dismissed his claims for declaratory relief, commercial defamation, interference with prospective advantage, and wrongful removal

4

from the board of directors. Following an arbitration hearing, the arbitrator entered an award denying Alston's claims in their entirety and awarding attorney fees to respondents. Alston's ensuing petitions to vacate the awards were denied, and respondents' petition to confirm the award was granted. Alston timely appealed from the ensuing judgment in favor of respondents.[4]

## II.  DISCUSSION

Alston contends none of his causes of action were subject to arbitration and even if some of the causes of action had been subject to arbitration, the trial court erred by sending the entire case to arbitration.

### A.  *Standard of Review*

In cases like this one where "no conflicting extrinsic evidence [was] introduced to aid the interpretation of an agreement to arbitrate, the Court of Appeal reviews de novo a trial court's ruling on a petition to compel arbitration." (*California Correctional Peace Officers Assn. v. State of California* (2006) 142 Cal.App.4th 198, 204.)

"Although '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.]  In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.)

The de novo review standard likewise applies to the question of respondents' rights to enforce the arbitration agreement between GB and Alston. "Whether and to what extent [nonsignatories] can also enforce the arbitration clause is a question of law, which we review de novo." (*Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1283 (*Rowe*); see also *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 707–708.)

---

[4] GB has apparently been dissolved, and is not a party to this appeal.

**B.** *Respondents' Right to Enforce the Arbitration Agreement*

Alston's causes of action for intentional and negligent misrepresentation, and interference with prospective advantage, were alleged against Hoge and/or Hoffman as well as against GB. Alston maintains the trial court erred in sending these claims to arbitration even if they otherwise came within the arbitration agreement, because neither Hoge nor Hoffman was a party to the agreement. Although a signatory to the Agreement in his capacity as CEO of GB, Hoffman did not sign in his individual capacity and his signature therefore did not make him a party to it. (See *Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 990.)

Numerous cases recognize that agents of a signatory party, sued in that capacity by another party to an agreement, are entitled to the benefit of the agreement's arbitration provisions. (See, e.g., *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418 [individual nonsignatory defendants acting as agents for the Rams were entitled to the benefit of the arbitration provisions]; *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 614 [when plaintiff alleges defendant acted as an agent of a party to an arbitration agreement, defendant may enforce the agreement even though not a party thereto]; *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith* (3d Cir. 1993) 7 F.3d 1110, 1121 [because a principal is bound by a valid arbitration clause, its agent, employees and representatives are also covered]; *Nguyen v. Tran* (2007) 157 Cal.App.4th 1032, 1037 [same]; *Rowe, supra,* 153 Cal.App.4th at pp. 1284–1285 [corporate officers sued as alter ego and agent can enforce arbitration agreement]; *Lewsadder v. Mitchum*, *Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 261 [nonsignatory officer may compel arbitration].)

Here, it is undisputed Hoge and Hoffman both had preexisting agency relationships with GB. Alston's complaint alleged that at times pertinent to the dispute both Hoge and Hoffman had "been a Chief Executive Officer and Director of Glacier Bay," and thus agents of the signatory corporation. Alston's complaint likewise alleges, "Any allegation about acts of [GB] means that [GB] did the acts alleged through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority." The misrepresentation claims are

6

explicitly based on an agency theory that GB's "new management," specifically Hoge and Hoffman, worked in concert to present fraudulent financial information in order to attract and retain investors *for GB*. Although not as explicit, it may be inferred from Alston's interference with prospective advantage allegations that Hoffman undertook the offending actions as an agent for GB in retaliating against Alston for seeking to expose the company's financial fraud.

Respondents were sued here in their capacities as agents of GB and were entitled to the benefit of the arbitration provisions in Alston's written agreement with the company, if those provisions covered the claims he asserted against them. Alston claims this principle does not apply since he did not rely on terms of the Agreement to impose liability on respondents. We do not agree. It is true that if a signatory plaintiff sues a nonsignatory defendant claiming rights under a contract containing an arbitration clause, the nonsignatory would have a right to enforce the arbitration clause under equitable estoppel principles only insofar as the claims are based on the same facts and are inherently inseparable from his arbitrable claims against the signatory defendant. (See *Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 272 ["a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate"].) But we do not rely on equitable estoppel to find that respondents, sued here for their conduct and in their capacity *as agents of GB*, may assert GB's right to arbitration. The agency cases cited *ante* rely on principal-agent law, not estoppel. Alston provides no authority suggesting persons sued as agents of a corporate party must show the plaintiff is basing their liability on the terms of the contract with the corporation in order to enforce the arbitration agreement.

Alston also cites the fact that GB was winding down its operations before the arbitration began, and assertedly "did not participate in the arbitration in any way." According to Alston, nonsignatory agents of a corporation are not entitled to arbitration if the corporation is winding down or has ceased to exist and does not participate in the arbitration proceeding. Alston cites no authority for this proposition, and he fails to explain why the happenstance of GB's financial distress should relieve him of the

7

contractual duty to arbitrate claims against its agents or deprive the agents of the protection afforded to them by agency law.[5]

We turn now to Alston's contention that his causes of action, or some of them, did not come within the scope of paragraph 13 of the Agreement.

## C. *Scope of Arbitration Agreement*

The arbitration agreement in this case covered all claims, disputes, and controversies of any nature arising out of or relating to (1) the Agreement; (2) the interpretation, enforcement, breach, performance, or execution of the Agreement; and (3) Alston's "relationship" with GB or the termination of that relationship.

According to respondents, Alston's "relationship" to GB for purposes of paragraph 13 encompasses all of the relationships touched upon by the Agreement, including the employment relationship that was being terminated (addressed by paragraph 1) and the consultancy that was being created (addressed by paragraph 2), as well as his "Other Relationships" with GB as a stockholder and as a director, which were addressed in paragraphs 4, 5, and 6 of the Agreement. Paragraph 4, which Alston views as an all-important limitation on the scope of the Agreement, provides that the termination of Alston's employment relationship with GB would not alter his preexisting status, rights, and obligations as a stockholder or director "[e]xcept as expressly provided" in the Agreement. Paragraph 5 specifies how his vesting rights under a particular stock restriction agreement would be determined based on his future service as a director. Paragraph 6 provided that as long as Alston served "as an employee, consultant and/or director" of GB he could not interfere with GB's business relationships

---

[5] In any event, the premise of Alston's argument is not supported by the record. Although GB did not file a response to Alston's demand for arbitration proceeding, or appear in the evidentiary portion of the arbitral hearing on the merits, it did appear through counsel in prehearing proceedings, and in successfully opposing Alston's motion for discovery sanctions against it on the first day of the arbitral hearing. GB was identified as a party to the arbitration in the final award, and the award ran in its favor as well as in favor of Hoge and Hoffman. The award also assessed arbitration fees against GB in favor of Hoge, Hoffman, and Alston.

or engage in competitive activities, or activities creating "an actual or apparent conflict of interest," and it specified the Agreement did not modify or limit the fiduciary duties he owed to GB "by virtue of [his] status as a Board member or otherwise." The Agreement addresses still other relationships or potential relationships between Alston and GB. Paragraph 7 barred him from disparaging GB or any of its officers, directors, employees, shareholders, agents, products, or services. Paragraph 2 reconfirms Alston had continuing duties with respect to his use of intellectual property conceived or developed using GB's trade secrets, confidential information, or resources, whether before or after his term of employment.

Alston contends the Agreement is nothing more than a "one-year consulting agreement" and that its arbitration provision applies solely to disputes arising from that limited relationship. We disagree. Alston's "Consulting Services Agreement" with GB was addressed in one paragraph of the Agreement, paragraph 2. As described above, the Agreement encompassed other operative paragraphs independent of and outlasting the term of Alston's consultancy. These too are part of the context for understanding the parties' intent in agreeing to arbitrate "any and all claims, disputes or controversies of any nature whatsoever arising out of, or relating to, this Agreement, or . . . your relationship with the Company, or the termination of any such relationship . . . ." If the reference to Alston's "relationship with the Company" in paragraph 13 meant only his consultancy relationship, the language would be entirely superfluous because disputes arising from that relationship would already be covered by the preceding language concerning disputes arising out of or relating to "this Agreement." In view of the conflicts that had already arisen between Alston and GB's management, it is certainly not surprising that GB would have wanted to negotiate a broad arbitration agreement with Alston covering all potential disputes and claims that might arise in any of his ongoing relationships with the company.

Once respondents established the existence of a valid arbitration agreement covering them, it became Alston's burden to " ' "demonstrate that [the] arbitration clause *cannot* be interpreted to require arbitration of the dispute." ' [Citation.] In other words,

'an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' (*Dryer v. Los Angeles Rams*[, *supra*,] 40 Cal.3d 406, 414." (*Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316–317.)

Construing the arbitration language of paragraph 13 in light of the multiple relationships and duties addressed by the Agreement—including Alston's stockholder and director relationships with GB, and his ongoing duties with respect to GB's intellectual property rights and business reputation—we find the arbitration agreement is reasonably construed to cover all claims, disputes, or controversies of any nature arising out of, relating to, or requiring interpretation or enforcement with respect to *any* of these relationships or duties. Further, we specifically reject Alston's thesis that paragraph 4 of the Agreement excludes or exempts from the arbitration agreement any dispute arising from his relationships to the company as a shareholder or director. In our view, the intent of this paragraph is merely to confirm that the termination of Alston's employment relationship with GB would not in itself affect his status as a stockholder or director, or his rights and obligations under certain stock restriction agreements to which he was subject. It is not a blanket exemption of those relationships from the purview of the Agreement. By requiring arbitration of all disputes arising from his "relationship with the Company, or the termination of any such relationship," the Agreement does in fact expressly modify Alston's rights as a shareholder and director, assuming for purposes of analysis that the phrase "rights, duties or obligations" as used in paragraph 4 encompasses the right to seek legal redress in the courts.

Alston's specific causes of action in this case do arise out of relationships addressed in the Agreement and come within paragraph 13. His misrepresentation claims arose out of and relate to his relationship with GB as an investor/shareholder as confirmed and modified by the Agreement. The declaratory relief, defamation, and interference with prospective advantage causes of action arose out of, relate to, or would have involved interpretation of (1) Alston's postemployment duties with respect to GB's asserted intellectual property (paragraph 2(i) and exhibit B), (2) the scope of his ongoing

10

fiduciary duties to GB as a director (paragraph 6(c)), and (3) his agreement not to engage in competitive activity (paragraph 6(b)). Alston's sixth cause of action for wrongful termination of him as a director arose from, related to, or would have required interpretation of (1) his fiduciary duties as a director under paragraph 6(c) of the Agreement, and (2) his agreement not to disparage GB or its officers, directors, and employees under paragraph 7.

In sum, we find the arbitration agreement in this case was extremely broad in scope, can reasonably be construed to encompass all of Alston's causes of action against respondents and GB, and was fully enforceable by respondents with respect to the claims against them. The trial court did not err by compelling arbitration of the entire dispute.

### III.  DISPOSITION

The judgment is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.

_____
Banke, J.


11