Filed 7/5/23  Regents of the University of California v. Buttgenbach CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THOMAS BUTTGENBACH et al.,<br><br>    Defendants and Appellants. | A164833<br><br>(Alameda County Super. Ct. No. 21CV004034)<br><br>ORDER MODIFYING OPINION<br><br>[CHANGE IN JUDGMENT] |

The court, on its own motion, modifies the opinion that was filed on June 30, 2023, to correct a clerical error as follows:

On page 44 of the unredacted version of the opinion, and on page 41 of the redacted version, the last sentence of the disposition is deleted and the following sentence is inserted in its place:  "Appellants to recover costs on appeal."

This modification does change the appellate judgment.


Dated: _____                    _____ Humes, P.J.


1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Plaintiff and Respondent, v. THOMAS BUTTGENBACH et al., Defendants and Appellants. | A164833 (Alameda County Super. Ct. No. 21CV004034) |

This appeal is the latest chapter in an acrimonious dispute arising out of a solar development investment deal that did not go as the parties planned.  The whys and wherefores of the failure of this venture has already been litigated once in an arbitration between the investment firm that assisted The Regents in structuring the deal and managed the university's investment funds, and the parties that actually developed the solar projects.  Both sides accused the other of bearing the responsibility for the implosion of the venture.  Although the investment firm pursued the arbitration to recover The Regents' funds and The Regents assisted with the firm's case, The Regents was not a party to the arbitration.  The arbitrator ultimately ruled against the investment firm and for the solar developers.

On the day the arbitration hearing commenced, The Regents, itself, sought recompense on a parallel track and filed the instant lawsuit against

1

the solar developers based on the same acts of alleged wrongdoing at issue in the arbitration. The defendants moved to compel arbitration. Recognizing The Regents was not a signatory to the joint venture agreement due to the way The Regents and the investment firm structured the deal, defendants sought to compel arbitration on alternative theories, including agency and equitable estoppel. The trial court denied the motion without comment or reasons stated. We reverse.

## BACKGROUND

Defendant Thomas Buttgenbach entered the arena of solar energy development nearly a decade prior to the events at issue in this case. By 2012, his development entity had gained approval for what was then the world's largest solar farm. Buttgenbach's company continued to develop solar projects over the ensuing years. His business model was to undertake the development of a project (for example, obtaining the rights to land, preliminary approvals, and locating potential energy purchasers) and then selling the project at the construction-ready or operating-ready phase to others for completion and/or the production of power.

In 2018, Buttgenbach, who either had or was in the process of parting company with his then business partner, was seeking outside investors to support his solar development business. He entered into discussions with a new private equity firm, Upper Bay Infrastructure Partners (Upper Bay), about potential investors. [REDACTED.]

Later that year, the J.P. Morgan Private Equity Group ("JP Morgan entities") invested $135 million in what was effectively a newly created joint venture, 8minutenergy US Solar, LLC.[1] [REDACTED.]

---

[1] While technically a limited liability company, for ease of reference we shall refer to the company by its name or as "the joint venture." The parties

2

The joint venture agreement was between the two Buttgenbach entities (by Buttgenbach as president), the JP Morgan entities, and Upper Bay's own investment vehicle, MDS Capital, LCC (which Upper Bay calls its "affiliate").[2] The JP Morgan entities and MDS Capital were "[c]lass B" members of the joint venture. Buttgenbach's entities were "[c]lass A" members, and one of the entities (8minutenergy US Investor, LLC) was designated the "Managing Member."

The joint venture, in turn, entered into a management services contract with another Buttgenbach entity, 8minutenergy US Manager, LLC. As do the parties, we refer to this entity as the "manager" of the joint venture.

Given the structure of the joint venture and the attendant management agreement, The Regents characterizes the joint venture as a "mere holding company." Although the joint venture "legally owned the projects, it had no real physical operations or real assets of its own. Instead, [the manager] provided all of the services in connection with the [joint venture] [p]rojects and billed [the joint venture] for the [manager's] time and expenses directly attributable to the [joint venture] [p]rojects."

In the spring of 2019, Upper Bay, through MDS Capital, invested $40 million in the joint venture.[3]

[REDACTED] engaged in extensive discussions with the Upper Bay principals and with Buttgenbach directly about a potential investment in the joint venture and the structure any such investment would take. Upper Bay

have variously referred to the entity as the "Company," "DevCo," and the "JV Company."

[2] The agreement was, at that time, titled "Amended and Restated Limited Liability Company Agreement."

[3] At that time, the joint venture agreement was revised and retitled "Second Amended and Restated LLC Agreement."

supplied a substantial amount of written material for The Regents' team to review, some of which was prepared by Buttgenbach and his own team and passed on to The Regents' team by Upper Bay.

In January 2020, The Regents authorized a $150 million investment in the joint venture, but not directly. The Regents' chief investment officer had considered, but refused to authorize, an investment whereby The Regents "would become [a] direct . . . co-owner of [the joint venture] or otherwise bound by the [joint venture agreement]." Instead, The Regents entered into two "Upper Bay-controlled and managed investment funds" that were in the form of limited partnerships (Upper Bay Infrastructure Partners, LP and Upper Bay Infrastructure Partners UC Renewables SMA, LP). Upper Bay was the general partner; The Regents, the only limited partner in one and among the limited partners in the other. These two limited partnerships, in turn, invested in MDS Capital.[4] MDS Capital, in turn, funneled the investment funds into the joint venture.

At this time, the joint venture agreement was again revised and retitled "Third Amended and Restated Limited Liability Company Agreement."[5] The agreement, which is the operative agreement for purposes of this appeal, states it is between 8minutenergy US Solar, LLC and, among other entities, certain " 'JPM Investor[s],' " the "Private Equity Group of J.P. Morgan Investment Managements, Inc.," and "MDS Capital, LLC, a Delaware limited liability company ('Upper Bay')." (Underscoring omitted.) The agreement contains an arbitration provision. The management services

---

[4] The Regents sometimes refers to MDS Capital as " 'the Aggregator Fund.' "

[5] The parties refer to the agreement by way of the acronym "LLCA." We refer to it as the joint venture agreement.

4

agreement between the joint venture and the manager was also amended at about this same time.  This agreement also contains an arbitration provision.

Apparently, the relationship of the class A and class B members was rocky from the start.  Eventually, the four-member governing board of the joint venture (two members were class A members, and two, class B members) could not agree about a major business decision, and, in December 2020, the managing member served a formal deadlock notice on the class B members.  The Regents was not a member of the governing board.  But the class A and B members could invite up to three " '[o]bservers' " to meetings, and one of The Regents' key investment officers involved in the transaction was named as an observer and received materials concerning the joint venture.

In early February 2021, the class B members filed an arbitration demand, naming Buttgenbach, the managing member (8minutenergy US Investor, LLC), and the manager (8minuteenergy US Manager LLC) as the respondents.  The introduction of the demand commences with the following statement: "This dispute arises from Respondent Thomas Buttgenbach's fraud and conduct taken in total disregard of the best interests of the [joint venture] he controls and its investors in favor of his own self-interest, all of which constitute contractual violations."

The introduction went on to state that "The [c]lass B Investors—which include (i) Upper Bay Infrastructure Partners, through its affiliate MDS Capital, LLC ('Upper Bay'), an independently-owned private investment firm focused primarily on diversified North American infrastructure, and (ii) entities related to J.P. Morgan ('JPM Investors')—have collectively invested $325 million in the [joint venture].  The University of California Board of Regents has invested in the [joint venture] through Upper Bay."

The introduction then summarized the class B members claims as follows: "Starting in the fall of 2019, Mr. Buttgenbach, individually and through the Managing Member [of the joint venture], engaged in a campaign of fraud directed at the [c]lass B Investors by providing false and inflated financial projections to induce the [c]lass B Investors to invest substantial amounts of capital in the [joint venture] and subsequently to support a significant financing arrangement. Further, Mr. Buttgenbach, individually and through the Managing Member and the Manager [of the joint venture], then used that money to develop Projects which Mr. Buttgenbach sought to sell to buyers that he controlled or would co-manage, instead of capitalizing on an attractive broader market for solar development projects to obtain the best possible terms for the [joint venture] on an arm's length basis. Mr. Buttgenbach, individually and through the Managing Member [of the joint venture], also delayed the [joint venture's] audit reporting and failed to provide meaningful responses to books and records requests, thus concealing the impact of his wrongful conduct from the [c]lass B Investors. As described further below, this improper conduct by Mr. Buttgenbach constitutes 'Management Breaches' under the [joint venture agreement]. . . . The conduct alleged herein also constitutes breaches of the [management agreement]."

The 38-page demand goes on to detail the class B members' allegations and claims against Buttgenbach, the joint venture managing member, and the manager.

With respect to The Regents, the allegations recount acrimonious disputes between the class A and class B members before and during the time The Regents were in the process of evaluating and ultimately authorizing an investment in the joint venture. But "in reliance on financial

6

projections provided by the Managing Member," the parties "renegotiated the terms of the joint venture" and "ultimately, in January 2020," the class B members "agreed to invest additional capital into" the joint venture. Specifically, "Upper Bay [then] invested an additional $150 million in the [joint venture], consisting of funds provided by Upper Bay's investor, the University of California Board of Regents." The demand then chronicles the alleged misrepresentations and asserted improper changes in business strategy made by Buttgenbach and his entities.

Following this elaboration of the alleged facts and circumstances, the demand sets forth claims for fraud (against Buttgenbach, and the managing member and the manger of the joint venture), multiple breaches of the joint venture agreement (against Buttgenbach, and the managing member and the manger of the joint venture), and anticipatory breach of the joint venture agreement (against the managing member and the manager of the joint venture).

The record before us contains a very limited selection of the materials filed in, or generated in the course of, the arbitration. [REDACTED.]

The record before us contains no opposition by the class B members and nothing about the specific outcome of this motion. It appears to have remained undecided, since the arbitrator, in an interim arbitration award issued a year later, at the end of January 2022, stated the claims against Buttgenbach individually were "presumed to have been dismissed with prejudice in August [2021]," when the class B members dismissed with prejudice all of the claims set forth in their original demand.

What we also know is that shortly before the arbitration hearing was set to commence in mid-August 2021, a serious dispute erupted between the parties as to the conduct of the attorney representing the class B members.

Ten days before the hearing was scheduled to start, class B's counsel withdrew and, as alluded to above, filed a dismissal with prejudice of all the class B members' claims set forth in the demand.

At that point, the cross-demand for arbitration the class A members had filed became the operative demand. Class A members maintained the class B members had, themselves, breached numerous provisions of the joint venture agreement, tortiously interfered with the joint venture's business relationships, and breached the implied covenant of good faith and fair dealing.

[REDACTED.]

[REDACTED.]

In the meantime, in early July, the managing member of the joint venture had served an "Unwinding Notice" on the class B members based on the previously sent deadlock notice. This notice generated a new spate of disputes, which were recounted in an "Amended Demand For Arbitration" filed by the class B members. (Boldface & some capitalization omitted.)

In their amended demand, the class B members described themselves as "MDS Capital, LLC" and "various investment vehicles affiliated with JP Morgan Chase (the 'JPM Investors')." MDS was further described as "an investment vehicle affiliated with Upper Bay Infrastructure Partners, L.P.," an "independently-owned private investment firm focused primarily on diversified North American infrastructure." "The [c]lass B Investors are fiduciaries, acting for the benefit of their investors, which consist of various pension funds, institutions of higher learning, municipalities, and insurers, among others."

The introduction of the amended demand commenced with the following statement: "This arbitration originally concerned a dispute over the

8

governance of a joint venture . . . that arose after a series of self-interested dealings by the [joint venture's] controller, Dr. Thomas Buttgenbach. In the midst of the arbitration, the Managing Member [of the joint venture] initiated the process of unwinding the [joint venture]. Claimants, who hold the [c]lass B interest in the [joint venture] (the '[c]lass B Investors'), strongly disagreed with that decision but ultimately determined that it would be fruitless to continue spending money and resources fighting over the [joint venture's] governance. They dismissed their claims and turned their focus to exiting the investment pursuant to the agreed process [in the joint venture agreement]." The amended demand continued that "[r]ather than cooperating to achieve an orderly exit from the joint venture . . . Dr. Buttgenbach and entities that he controls . . . have embarked on a campaign to expropriate the entire $325 million value of the [c]lass B Investors' investment." The introduction also maintained Buttgenbach and the entities he controlled failed to provide financial and business reports and maintained Buttenbach and his entities had "breached more than ten separate provisions" of the joint venture agreement. (Italics omitted.) "The clear purpose behind all these actions," according to the class B members, was "to frustrate the [c]lass B Investors' ability to exit on commercial terms and to squeeze them out of the joint venture for around $70, while pocketing their entire $325,000,000 investment."

The 33-page amended demand went on to detail the asserted wrongful actions that Buttgenbach and his entities had, and were, committing in connection with the unwinding of the joint venture. It then set forth the following claims: "Breach of Contract in Connection with the Unwinding," which embraced five sub-claims based on specific provisions of the joint venture agreement; "Breach of the Implied Covenant of Good Faith and Fair

9

Dealing in Connection with the Unwinding"; "Anticipatory Breach of Contract"; "Breach of Contract–Informational Rights," which embraced five sub-claims; and Violation of the Delaware Limited Liability Companies Act. (Boldface omitted.)

The arbitration hearing—on the class A members' claims and the claims set forth in the class B members' amended demand—finally commenced on December 13, 2021.

That same day, The Regents filed the instant lawsuit against Buttgenbach and the six 8minutenergy entities connected either directly or indirectly with the events involving the joint venture (collectively "defendants"), alleging multiple violations of California's False Claims Act (Gov. Code, § 12651, "CFCA"). The factual allegations underlying the statutory claims mirror many of the allegations of the class B members' original arbitration demand and amended demand.

The lawsuit precipitated a heated motion to compel arbitration by defendants, who accused The Regents of filing "it on the eve of the first day [of the arbitration hearing] after Defendants refused to concede to [The Regents'] outrageous demands."[6] "At best," said defendants, "this lawsuit is nothing more than [The Regents'] attempt at a do-over, as it is apparently unhappy with the tenor of the Arbitration proceedings and advice of its former counsel."

Recognizing that The Regents was not a party to either the joint venture agreement or the management agreement, defendants asserted The Regents' statutory claims are nevertheless "inextricably intertwined" with

_____

[6] We do not discuss here the specifics of defendants' motion to compel arbitration or The Regents' opposition thereto. Rather, we only briefly summarize the moving and opposing papers and discuss the parties' respective positions in more detail, *infra*.

10

the provisions of those agreements, and therefore it should be equitably estopped from disavowing the arbitration provisions therein. Defendants alternatively claimed Upper Bay was acting as The Regents' "agent" when it entered into the joint venture agreement and thus bound The Regents to the provisions therein, including the arbitration provision.[7]

Three days before defendants filed their motion to compel arbitration, the class A members had filed an ex parte " 'emergency motion' " in the arbitration asking the arbitrator to, among other things, " 'confirm' " The Regents' participation in the arbitration.

Before The Regents' opposition to defendants' motion to compel was due, the arbitrator issued an "Interim Award," ruling on the merits of the arbitrated claims. Suffice it to say, the arbitrator rejected the class B members claims in their amended demand and ruled in favor of the claims advanced by the class A members. The arbitrator also included a section in the award discussing The Regents' lawsuit, stating, among other things, that "[a]lthough [c]lass B claims now that [The Regents] is an unrelated third party to the arbitration not bound by the Protective Order and other rulings in the arbitration, [The Regents] has been a participant in the arbitration from the beginning."

The Regents filed a vociferous opposition to the motion to compel. It accused Buttgenbach of seeking and obtaining "improper findings from the arbitrator, unrelated to the concluded merits hearing, purportedly (i) binding the University to the proceeding, (ii) finding the University's investment manager was its agent for litigation, and (iii) precluding the University's

---

[7] Defendants also asserted The Regents was a "third-party beneficiary" of those agreements, but do not pursue that theory on appeal. (Boldface omitted.)

11

[statutory false claims act claims] because the investment manager dismissed its own, distinct fraud claims earlier in the [arbitration]." The Regents asserted it never signed any arbitration agreement, it was "never served" with any demand for arbitration or any of the pleadings and notices associated therewith, never appeared as a party in the arbitration (members of its investment team appeared only pursuant to subpoenas), and it never had the chance to assert claims, conduct discovery, submit evidence, or argue before the arbitrator. It further asserted defendants should be judicially estopped from seeking to compel arbitration in light of (a) Buttgenbach's claim that because he was not a signatory to the joint venture and management agreements, he was not a proper party to the arbitration, and (b) the class A members' assertion that they intended to sue "non-parties," including The Regents, in state court for their allegedly tortious conduct in connection with the dispute.

In reply, defendants accused The Regents of making "pervasive misrepresentations" about its involvement in the arbitration. Defendants maintained Upper Bay clearly acted as The Regents' "agent" in executing the joint venture agreement and in pursuing and maintaining the arbitration. As for equitable estoppel, defendants maintained The Regents' references to the joint venture agreement in its complaint are not mere " 'context' " for their statutory claims, but are the very basis of their claims, and The Regents cannot, in turn, ignore the arbitration provision in that agreement.

Although there was a hearing on defendants' motion, there is no transcript in the record. The only document reflecting the court's denial of the motion is a minute order that states simply that a tentative was published and contested, and the motion "is Denied."

12

## DISCUSSION

As the courts have frequently stated, federal and state public policy strongly favors arbitration and seeks to ensure that " 'private agreements to arbitrate are enforced according to their terms.' " (*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662, 664; see *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)  However, " ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate. . . ." ' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744; accord, *Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 858–859 (*Cohen*); *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 17.)  " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit.' " (*AT&T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 648; see also *Cohen*, 31 Cal.App.5th at pp. 856–858.)

Thus, " ' "[g]enerally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it." ' " (*Pillar Project AG v. Payward Ventures, Inc.* (2021) 64 Cal.App.5th 671, 675 (*Pillar Project*).)  However, both California and federal courts have recognized certain exceptions which permit a nonsignatory to an agreement with an arbitration clause "to compel arbitration of, or be compelled to arbitrate, a dispute arising within the scope of that agreement." (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1353.)  " ' " 'As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." ' " ' " (*Pillar Project,* at

13

p. 675; accord, *Cohen, supra,* 31 Cal.App.5th 840, 859.) Defendants here invoke the theories of agency and equitable estoppel.

" ' "Whether an arbitration agreement is binding on a third party (e.g., a nonsignatory) is a question of law subject to de novo review." ' (*Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 468. . . .) Nevertheless, we presume the court found every fact and drew every permissible inference necessary to support its judgment or order, and we defer to the court's determination of credibility of the witnesses and weight of the evidence in resolving disputed facts. (*Jones v. Jacobson* [2011] 195 Cal.App.4th [1,] 12. . . .) '[I]f there are material facts in dispute, we must accept the trial court's resolution of such disputed facts when supported by substantial evidence.' " (*Cohen, supra,* 31 Cal.App.5th at p. 859.)

### *Judicial Estoppel*

Before we consider the theories of agency and equitable estoppel, we address The Regents' assertion that defendants should be judicially estopped from moving to compel arbitration. The Regents bases this assertion on (a) Buttgenbach's claim during the arbitration that because he was not a signatory to the joint venture and management agreements, he was not a proper party to the arbitration, and (b) the class A members' assertion that they intended to sue " 'non-parties,' " including The Regents, in state court for allegedly tortious conduct in connection with the dispute. As The Regents point out, judicial estoppel was the first defense it raised in the trial court in opposition to defendants' motion to compel arbitration, defendants did not address that issue in their reply memorandum in support of their motion, the trial court did not expressly reject this defense but denied the motion without explanation, and defendants did not address judicial estoppel in their opening brief on appeal (but did respond to The Regents' argument in their closing

14

brief).  We could therefore conclude, as The Regents urges us to do, that defendants implicitly conceded the point in the trial court and have forfeited the issue on appeal.  (See *Tukes v. Richard* (2022) 81 Cal.App.5th 1, 20 [appellate court can deem waived all alternative grounds that support trial court ruling if appellant fails to address them in his or her opening brief].)  However, "the rule that legal arguments made in the trial court but not addressed in an opening brief are forfeited is a discretionary one, and we may consider the merits of the arguments."  (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 321.)  We decline to find forfeiture here.  Whether defendants are judicially estopped is an issue of law that is easily resolved on the record before us.

The doctrine of judicial estoppel, which is sometimes referred to as the "doctrine of ' " 'preclusion of inconsistent positions,' " ' " is designed to prevent litigants from gaining an "advantage by asserting one position [in litigation], and then seeking a second advantage by asserting an incompatible position."  (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 448 (*Minish*); *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 (*MW Erectors*).)  Preventing litigants from " ' " ' "playing 'fast and loose with the courts' " ' " ' " (*Minish*, at p. 449) in this fashion, in turn, serves " ' "to protect parties from opponents' unfair strategies" ' " and, more importantly, to " ' "maintain the integrity of the judicial system." ' "  (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 (*Aguilar*).)

Before the doctrine can be invoked, a court must find five "necessary elements"—namely, that " ' "(1) the same party [or its attorney] has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the

15

two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." ' " (*MW Erectors, supra*, 36 Cal.4th at p. 422, quoting *Aguilar, supra*, 32 Cal.4th at pp. 986–987.) But even if these elements are met, because judicial estoppel "is an equitable doctrine" whether it will be invoked "is discretionary." (*MW Erectors*, at p. 422, italics omitted.) And because invocation of the doctrine can "produce harsh consequences," it is to be " 'applied with caution and limited to egregious circumstances.' " (*Minish, supra*, 214 Cal.App.4th at p. 449.)

The Regents' claim of judicial estoppel demonstrably fails on the third element—that " ' "the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true)." ' " (*MW Erectors, supra*, 36 Cal.4th at p. 422.) [REDACTED.] As to the claims against Buttgenbach, individually, the arbitrator stated they were "presumed to have been dismissed with prejudice in August [2021]" when the class B investors dismissed all of the claims set forth in their original demand with prejudice. And even if they were not dismissed, the arbitrator went on to find they were not supported by the evidence presented during the arbitration hearing. As to the claims against the manager of the joint venture, the arbitrator rejected them on the merits.

The Regents' assertion that the "arbitrator accepted [the defendants'] position as true by not treating the [Regents] as a party to the arbitration" is nonsensical. The Regents never maintained it was a *party* to the arbitration, it never sought to become a *party* to the arbitration, and the arbitrator never ruled that it was a *party*. And while The Regents complain defendants have now "reverse[d] course" by arguing The Regents can be compelled to arbitrate (not as a party to the governing agreements but under the theories of agency and equitable estoppel), we observe that The Regents have "reverse[d]

16

course" from that taken by the class B members during the arbitration who maintained Buttgenbach could be compelled to arbitrate even though he was not a signatory to the governing agreements. Even assuming The Regents is not bound by the actions of the class B members, the record makes it abundantly clear The Regents was well aware of what was happening over the course of the arbitration, and it is hardly "equitable" for it to now be disavowing a position advocated by the class B members from which it hoped to benefit.

Given that The Regents cannot establish the third element of judicial estoppel, we need not, and do not, consider any of the other elements, and we turn to the two theories defendants have pursued on appeal with respect to arbitration.

### Agency

We first consider whether The Regents can, under an agency theory, be compelled to arbitrate all the claims asserted in its complaint.

In *Cohen, supra,* 31 Cal.App.5th at pages 861–865, the court examined in detail the theory of agency in the context of arbitration and, specifically, in the parent-subsidiary context. It held that a signatory subsidiary can compel a nonsignatory parent company to arbitrate on an agency theory "where (a) the parent controlled the subsidiary to such an extent that the subsidiary was a mere agent or instrumentality of the parent and (b) the claims against the parent arose out of the agency relationship." (*Id.* at p. 847.) While we are not here considering a parent-subsidiary relationship, the general principles the court discussed are pertinent.

"Not every agency relationship," the court explained, "will bind a non-signatory to an arbitration agreement." (*Cohen, supra,* 31 Cal.App.5th at p. 859, citing *Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295,

17

304–305 (*Jensen*) ["rejecting the argument that an 'agency relationship alone gives the signatory the authority to bind the nonsignatory' "].) " 'Every California case finding nonsignatories to be bound to arbitrate is based on facts that demonstrate, in one way or another, the signatory's implicit authority to act on behalf of the nonsignatory.' " (*Cohen,* at p. 860, quoting *Jensen,* at p. 304.) "Courts also have stated that the agency relationship between the nonsignatory and the signatory must make it ' "equitable to compel the non-signatory" ' to arbitrate." (*Cohen,* at p. 860, quoting *Jensen*, at p. 301.) But equity, without more, is not enough. (*Cohen,* at p. 860, citing *Jensen*, at p. 304.)

Courts must also ask " 'who is seeking to bind whom, and on what basis.' " (*Cohen, supra,* 31 Cal.App.5th at p. 860, quoting *Jensen*, *supra*, 18 Cal.App.5th at p. 303.) " '[T]he question of whether a principal's acts bind an agent is fundamentally different from the question of whether an agent's acts bind a principal.' " (*Cohen,* at p. 860, quoting *Jenson,* at p. 303.) Cases involving the second scenario—the alleged scenario here—are "less commonly litigated." (*Cohen,* at p. 861.)

*Cohen* pointed out that "[i]n general, a parent company is not liable on a contract signed by its subsidiary 'simply because it is a wholly owned subsidiary.' (*Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 991 . . . ; see also *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 ['[o]rdinarily a [limited liability company] is considered a separate legal entity, distinct from . . . its members and managers'].)" (*Cohen, supra,* 31 Cal.App.5th at p. 861–862.) But "the agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises 'sufficient control over the [sub-

sidiary's] activities' such that the subsidiary becomes a 'mere agen[t] or "instrumentality" of the parent.' (9 Witkin, Summary of Cal. Law (11th ed. 2017) Corporations, § 19, p. 821; see *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 741 (*Laird*) [[the plaintiff must show] . . . ' "a parent corporation *so controls the subsidiary* as to cause the subsidiary to become *merely* the agent or instrumentality of the parent" '], disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512. . . .)" (*Cohen,* at p. 862.) " ' "The nature of the control exercised by the parent over the subsidiary . . . must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." ' " (*Ibid.*, quoting *Ruhnke v. SkinMedica, Inc.* (C.D.Cal., Sept. 5, 2014, No. SACV 14-0420-DOC (JPRx)) 2014 WL 12577172, at p. *10 (*Ruhnke*) [under California law, parent may be bound to contracts executed by subsidiary where " 'the nature and extent of the control exercised over the subsidiary by the parent' [is] 'so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent' "] and citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 541–542 (*Sonora Diamond*) ["if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state," but "[a]s a practical matter, the parent must

be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy"].[8])

*Cohen* went on to observe there was no California case in which a party sought to bind a nonsignatory parent of a signatory subsidiary to an arbitration agreement on an agency theory. (*Cohen, supra,* 31 Cal.App.5th at p. 863.) But the court did locate a federal case, *E.I. DuPont de Nemours v. Rhone Poulenc Fiber* (3d Cir. 2001) 269 F.3d 187 (*DuPont*). "In that case the court held a nonsignatory parent could be compelled to arbitrate based on an arbitration agreement signed by its subsidiary where the subsidiary acted as an agent for the parent and the cause of action arose out of that relationship." (*Cohen,* at p. 863.) Applying Delaware law, *Du Pont* held, "Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing." (*Dupont*, at p. 198; accord, 21 Williston on Contracts (4th ed. 2023) § 57:19.) Because the party seeking to compel arbitration "did not show the cause of action related to the agency relationship between the parent and its subsidiary that entered into the contract containing an arbitration agreement," the federal court held the parent could not be compelled to arbitrate a claim arising from the underlying con-

---

[8] "The court in *Sonora Diamond* distinguished the agency theory of liability from the alter ego theory by explaining that 'the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles.'" (*Cohen, supra,* 31 Cal.App.5th at p. 863, fn. 13, quoting *Sonora Diamond, supra*, 83 Cal.App.4th at p. 541.)

tract.  (*Cohen,* at p. 863.)  *Cohen* pointed out this tracked California law permitting a "nonsignatory defendant to compel a signatory plaintiff to arbitrate where there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory."  (*Ibid.*)

The court therefore "adopt[ed] the standard in *DuPont* to determine whether a party to an arbitration agreement can compel a nonsignatory parent of a signatory subsidiary to arbitrate under the agency exception."  (*Cohen*, *supra,* 31 Cal.App.5th at p. 864.)  It reiterated, however, "that an arbitration agreement signed by a subsidiary may bind the parent company only where the party seeking to compel arbitration can show the parent had sufficient control over the subsidiary's activities such that the subsidiary was a mere agent or instrumentality of the parent *and* the causes of action or claims against the parent arise out of this relationship."  (*Id.* at pp. 864–865.)

This standard is adaptable to the situation here—where defendants claim Upper Bay was The Regents' agent and thus bound The Regents to the joint venture and management agreements and the arbitration provisions therein.

As defendants point out, The Regents worked closely with Upper Bay in determining whether to authorize an investment in the joint venture and how such an investment should be structured.  They cite, for example, to Maselli's declaration that The Regents entered a limited partnership with Upper Bay, to the class B members' allegations in their amended demand that Upper Bay (and JP Morgan) acted as "fiduciaries" of and were "acting for the benefit of" their respective investors, and to Maselli's testimony at the arbitration hearing that Upper Bay was "acting on [the] Regents' behalf" in investing in the

21

joint venture through its affiliate MDS Capital.[9]  Defendants also point out that in the arbitration, the class B members' attorney, after stating during opening that he was going to give the arbitrator "a sense of who the [c]lass B investors are," proceeded to identify The Regents, stating the university was "well known to everyone" and that its top investment officers would be testifying.

Defendants also cite to provisions of the investment and limited partnership agreements between The Regents and Upper Bay.  [REDACTED.]  In fact, as defendants elaborate in their appellant's closing brief, these agreements effectively directed that The Regents' funds be invested in the joint venture.

Defendants additionally cite to the arbitration testimony of Albert Lee, a director at UC Investments for the " 'real assets' " class, who was responsible for conducting the due diligence in connection with the joint venture and deciding whether the proposed investment would be "a good" one.  Lee testified the joint venture agreement was "something that, obviously, we had to review."  He also testified he "did not have the opportunity to negotiate [the agreement].  That was done by the Upper Bay," which Lee described as "our investment manager for this investment."  "Upper Bay's position and role in this investment [was] to review things such as the [joint venture agreement]

_____

[9]  Maselli agreed Upper Bay served "as UC Regents' investment manager for purposes of UC Regents' investment in the JV company."  And in response to being asked whether Upper Bay acted "on behalf of UC Regents with regard to the JV company, 8minute, and Tom Buttgenbach," he replied, "Yes.  So as the—so as the investment manager for the Upper Bay fund, the J.P. Morgan co-investment, and the UC Regents co-investment, we're essentially, the manager of the entire 325 million and were acting on their behalf. . . . [¶] . . . [E]ssentially, we're the investment manager for J.P. Morgan, which–and UC Regents and the fund, and we have a fiduciary duty to all of them."

for a limited partner such as the UC. So [he] would have expected them to review this type of information and looked out for our best interests." However, asked whether, "had [he] wanted changes" to have been made to provisions of the joint venture agreement, Upper Bay would "have listened" to him, he replied he believed Upper Bay "would definitely listen to me, yes."

[REDACTED.]

Maselli similarly stated in a declaration filed by The Regents in opposition to the motion, that in agreeing during the arbitration that Upper Bay " 'was authorized to act on behalf of UC Regents with regard to the JV company, 8minute and Tom Buttgenbach,' " he "was referring to Upper Bay's authority and obligations in its position as the general partner for the Upper Bay investment funds . . . , in which the University is a limited partner." The Regents was "not a party to [the joint venture agreement] that governs Upper Bay's obligations regarding the JV Company." "Upper Bay has never agreed to represent, or act as an agent for, the University in any manner except as set forth in" the limited partnership agreements.

Lee similarly stated in a declaration filed in opposition to the motion, that the limited partnership agreements "contain standard market terms, and specifically do so with respect to exclusive general partner control over the investment fund partnerships and the expenses that the general partner may draw down from the capital commitments of the investors." He maintained The Regents had "no authority to exercise, and never exercised, any control over Upper Bay, including its decisions with respect to managing the [joint venture] investment or making litigation decisions," including any decisions in connection with the arbitration.

While defendants insist the record unequivocally shows Upper Bay was The Regents' agent, it does not reflect " ' "purposeful disregard of [Upper

23

Bay's] independent . . . existence" ' " or establish that " ' "the nature and extent of the control exercised" ' " over Upper Bay by The Regents is " ' "so pervasive and continual that [Upper Bay] may be considered nothing more than an agent or instrumentality of [The Regents]." ' " (*Cohen, supra,* 31 Cal.App.5th at p. 862, quoting *Ruhnke, supra,* 2014 WL 12577172, at p. *10.)

The parties cite a potpourri of cases concerning agency, most for the general principles of agency law so ably discussed in *Cohen.* Two of the cases, however, bear discussion.

The first is *Crypto Asset Fund, LLC v. OPSkins Group Inc.* (C.D. Cal. 2020) 478 F.Supp.3d 919 (*Crypto Asset*), which arguably supports the outcome defendants advocate. In that case, an entity that purchased crypto currency sued the firm that sold the "digital utility tokens" through a series of offerings. (*Id.* at pp. 922–923.) The purchasing entity conveyed the funds for the transaction through an individual who sent the money on to the seller and executed the terms of sale, which contained an arbitration provision. That individual, in turn, was to receive the crypto currency from the seller and forward it to the purchasing entity. (*Id.* at p. 923.) In a section titled " 'Representations and Warranties,' " the terms of sale stated that " 'By purchasing Tokens, you represent and warrant that . . . [i]f you are purchasing Tokens on behalf of any entity, you are authorized to accept these Terms on such entity's behalf.' " (*Id.* at p. 924.) It was undisputed that prior to the purchase, the purchasing entity received a copy of the terms of sale. (*Id.* at p. 923.) After the purchase, the seller was slow to release the tokens, and during the delay in delivery, the purchasing entity was unable to take advantage of market gains made by other investors. (*Id.* at pp. 924–925.) The

24

purchasing entity sued, and the seller moved to compel arbitration based on the provision in the terms of sale. (*Id.* at pp. 922, 925.)

The district court ruled the purchasing entity was bound by the arbitration provision in the terms of sale. The court pointed out that the entity told the individual who handled the transaction the number of tokens it wanted to purchase, assured the seller the individual would " 'cover' " the sale, and then confirmed to the seller it had "received the Ether," would " 'fund now,' " and had " 'got[ten] the agreements.' " (*Crypto Asset, supra,* 478 F.Supp.3d at p. 926, italics omitted.) The purchasing entity also told the seller "multiple times" the individual worked on its behalf when it came to initial coin offerings (ICO's), and described him as " 'head of [its] ICO team' " and "head of ICO research." (*Ibid.*) The court found it was "plain" that the purchasing entity sent the individual to buy the tokens "on [its] behalf." (*Id.* at p. 927.) "Signing an arbitration agreement was a necessary step in making that purchase, and Plaintiffs are therefore bound by the agreement [the individual] entered into in purchasing the . . . tokens." (*Ibid.*)

*Crypto Asset* bears some similarity to the case at hand. But there are also significant differences. Unlike the individual in that case who was held out as head of the purchasing entity's ICO team and head of ICO research, Upper Bay is an independent investment company with clients other than The Regents. More significantly, Upper Bay did not, through MDS Capital, make any representation or warrant that it was authorized to agree to the joint venture agreement and accept its terms on The Regents' behalf.

The second case that bears mention is *Pillar Project, supra,* 64 Cal.App.5th 671, which arguably supports The Regents' position. This case also arose in the crypto currency sphere. The plaintiff hired a third-party service to convert its cryptocurrency into conventional currency. (*Id.* at

25

p. 674.)  The third-party conducted business on the defendant's online exchange platform, and to do so, had had to set up an account and agree to terms of service that included an arbitration provision.  (*Ibid.*)  While the third party was in the process of converting the plaintiff's crypto currency, a cyber bandit stole approximately $4 million Euro from its account that belonged to the plaintiff.  (*Ibid.*)  The plaintiff sued the exchange platform, which moved to compel arbitration on the basis of the arbitration provision in the terms of service the third party had agreed to in opening its account.  (*Ibid.*)  The trial court denied the motion.  (*Id.* at p. 675.)

The Court of Appeal affirmed.  As to the theory of agency, the court first observed, citing to *Cohen,* that the only evidence of the nature of the plaintiffs' relationship with the third party was that the plaintiff had contracted with that party " 'to facilitate' " the conversion of its currency and " 'to transfer those conventional currencies' " into the plaintiff's bank account.  This was "not evidence that [the third party] had the authority to enter into arbitration agreements (or other contracts) on Plaintiff's behalf; indeed, Plaintiff submitted evidence that [the third party] did not have such authority."  (*Pillar Project, supra*, 64 Cal.App.5th at p. 676.)  Further, there was no evidence that the third party was acting as the plaintiff's agent when it agreed to the terms of service nearly two years *before* it contracted with the plaintiff.  (*Ibid.*)  Nor could it be said that the plaintiff had ratified the terms of service and the arbitration provision therein on retaining the third party to convert its crypto-currency, as there was no evidence the plaintiff knew about the terms.  (*Ibid.*)

[REDACTED.]  However, The Regents' relationship with Upper Bay was *far* more involved than the relationship between the owner of the crypto currency and the third party exchange service at issue in *Pillar Project*.  And

26

unlike the account terms of service in *Pillar Project*, the operative joint venture agreement was not executed before Upper Bay entered into any relationship with The Regents. To the contrary, the joint venture agreement was amended and restated at the time The Regents authorized an investment in the joint venture specifically to take account of that investment. Furthermore, The Regents admittedly had every opportunity to review the joint venture agreement and did so. And had The Regents wanted changes made to the agreement, it could have asked Upper Bay to make them and was confident Upper Bay would have "listened" to its request.

On this record, the question of agency is exceedingly close. We need not, however, finally decide the issue since we conclude, as we explain below, that The Regents can, and should, be compelled to arbitrate under the theory of equitable estoppel.

### *Equitable Estoppel*

"When a [signatory] plaintiff brings a claim which *relies on contract terms* against a defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement. [Citations.] There is no reason why this doctrine should not be equally applicable to a nonsignatory plaintiff. When that plaintiff is suing on a contract—on the basis that, even though the plaintiff was not a party to the contract, the plaintiff is nonetheless entitled to recover for its breach, the plaintiff should be equitably estopped from repudiating the contract's arbitration clause. (Cf. *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1070–1071 . . . (*Crowley*) [indicating federal law applies estoppel in such circumstances when the nonsignatory received direct benefits under the contract]; see also *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84 . . . [stating that no person can be permitted to adopt that part of a

27

contract which is beneficial to him or her and simultaneously reject its burdens, including the burden to arbitrate].)" (*JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1239–1240 (*JSM Tuscany*).) Such plaintiffs "cannot assert that they are entitled to recover according to the terms of that agreement, while simultaneously repudiating the arbitration clause contained therein." (*Id.* at p. 1241.)

"Moreover, . . . there is no rational basis to limit this conclusion to claims expressly based on" breach of the pertinent contract. (*JSM Tuscany, supra,* 193 Cal.App.4th at p. 1241.) "The equitable estoppel doctrine extends to claims that are dependent upon or inextricably intertwined with the obligations imposed by the contract containing the arbitration clause. As with signatory plaintiffs, when nonsignatory plaintiffs are pursuing such claims, they should be bound by the arbitration clause in the contract which is integral to their claims." (*Ibid.*) " 'The fundamental point' is that a party is 'not entitled to make use of [a contract containing an arbitration clause] as long as it work[s] to [his or] her advantage, then attempt to avoid its application in defining the forum in which [his or] her dispute . . . should be resolved.' (*NORCAL Mutual, supra,* 84 Cal.App.4th 64, 84.)"[10] (*Jensen, supra,* 18 Cal.App.5th at p. 306.)

The Regents maintains it cannot be compelled to arbitrate under the theory of equitable estoppel because, as a public entity, the doctrine cannot

---

[10] There is a nuanced difference between "(1) whether a *signatory* plaintiff's claims sufficiently relate to or arise from a contract, so as to fall within the scope of the arbitration clause that was agreed to by the parties to that contract; and (2) whether a *nonsignatory* plaintiff's claims are so dependent on and inextricably intertwined with the underlying contractual obligations of the agreement containing the arbitration clause that equity requires those claims to be arbitrated." (*Jensen, supra,* 18 Cal.App.5th at p. 307; *ibid.* [these are "separate and discrete" inquiries].)

be applied to it.  As The Regents points out, as a general matter equitable estoppel " 'will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy.' "  (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279; *id.* at p. 280 [city not estopped from denying approval of subdivision map where city employees made no representations to the contrary].)  But this does not mean public entities are immune from the doctrine.  (E.g., *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 491–492 [even under the heightened requirements of equitable estoppel in the property title context, "the activities, representations, and conduct of the state" and the city rose "to the level of culpability necessary to support an equitable estoppel against them"]; *Santos v. Los Angeles Unified School Dist.* (2017) 17 Cal.App.5th 1065, 1075–1079 [plaintiffs presented evidence raising triable issue that school district should be equitably estopped from asserting noncompliance with government claims statute as a defense].)  " 'The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel. . . .' (*Medina v. Board of Retirement* [(2003)] 112 Cal.App.4th [864,] 868–869 [(*Medina*)]. . . .)" (*Emma Corp. v. Inglewood Unified School Dist.* (2004) 114 Cal.App.4th 1018, 1030; *id.* at p. 1031 [equitable estoppel applicable where public entity "deliberately misled a mistaken bidder from timely complying with the bid withdrawal statutes"].)

We therefore turn to the specific circumstances of this case to determine whether the elements of equitable estoppel to disavow an arbitration

29

provision are met, and then consider whether as a matter equity The Regents should be compelled to arbitrate under this theory.[11]

### *Dependent on or Intertwined with Joint Venture Agreement*

*First Cause of Action*: The Regents' first cause of action is titled "Cal. Gov. Code[,] § 12651(a)(1)—Submission of False Claims." The operative allegations identify a number of alleged misrepresentations.

With respect to Buttgenbach and his development company (8minute Solar Energy, LLC), The Regents identify a number of alleged misrepresentations made "to induce the University to approve the authorization of the $150 million investment in [the joint venture]." These claims, based on alleged statements during the pre-contractual negotiations that culminated in the execution of the joint venture agreement, are essentially claims of fraudulent inducement. In *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322–323 (*Erickson*), our Supreme Court embraced the view of the majority of courts—that claims of fraudulent inducement in entering a contract are

---

[11] The instant case is not like *El Camino Community Dist. v. Superior Court* (1985) 173 Cal.App.3d 606 and *Santa Monica Unified School Dist. v. Persh* (1970) 5 Cal.App.3d 945, which The Regents cites in its respondent's brief. In those cases, the courts refused to enforce arbitration clauses in contracts the entities had signed through their personnel but which had not been approved by the districts' governing boards as required by the Education Code and thus were invalid. (*El Camino,* at pp. 612–614 [college not estopped from disputing validity of contract that contained arbitration provision where contract had not been approved by Board of Trustees as required by statute; those contracting with educational institutions are deemed to be aware of the limitations on their power to contract]; *Santa Monica,* at pp. 952–953 [school district could not be compelled to perform on contract for purchase of property as contract had not been approved by the district's board; "estoppel is not applicable to a municipal agency which has not acted in compliance with a statute which is the measure of its power"].)

arbitrable. The high court reaffirmed that rule in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415–416 (*Rosenthal*) in explaining the distinction between "fraud in the 'execution' or 'inception' of a contract," which are not arbitral, and "fraud in the 'inducement,' " which is arbitral. Fraud in the " 'execution' " or " 'inception' " of a contract " ' "goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all," ' " rendering the contract void and inoperative " ' "without the necessity of rescission." ' " (*Id.* at p. 415.) "Fraud in the inducement, by contrast, occurs when ' "the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable. In order to escape from its obligations the aggrieved party must rescind. . . ." ' " (*Ibid.*, italics omitted.) The Regents' claims are of the latter sort.

The Regents alleges, for example, that "Buttgenbach presented a 'fully funded' business plan to the University that contained a fixed budget, restrictions on the use of cash, financial projections, project sale timelines, and representations showing that, if investors provided funds in the requisite amount, no additional capital would be needed." (Italics omitted.) These allegations are directed at the performance of the joint venture and must be evaluated in considerable measure on the basis of the provisions of the joint venture agreement. Accordingly, these claims are dependent upon and/or inextricably intertwined with the terms of that agreement. (See *Ericksen, supra,* 35 Cal.3d at p. 324 ["the issue of fraud" asserted in the case " 'seem[ed] inextricably enmeshed in the other factual issues of the case' "].)

With respect to Buttgenbach and the manager of the joint venture (8minutenergy US Manager, LLC), The Regents identify other alleged misrepresentations. The first category of such misrepresentations consists of "claims for expenses that were unauthorized under the Management Services Agreement" that were assertedly "paid [by the joint venture] from the University's $150 million investment." These claims are also clearly dependent upon and/or inextricably intertwined with the terms of that agreement.[12] Indeed, it is that agreement which spells out what are and are not proper items for reimbursement, and The Regents' accusation of "false claims" depends on proving a breach of that agreement.

The second category of misrepresentations assertedly made by Buttgenbach and the manager consists of statements made in, and/or in connection with, the "Designated Project Contribution Notice" served on the class B members in conjunction with the unwinding process which the managing member commenced pursuant to the terms of the joint venture agreement. The Regents claims the amount "demanded" from the class B members ("over $4.1 billion within sixty days") was "false, inflated, and entirely unsupported" by the misrepresentations that allegedly were made prior to The Regents authorizing an investment in the joint venture. (Italics omitted.) This claim, too, is squarely dependent upon and/or inextricably intertwined with the terms of the joint venture agreement. It is that agreement which governs the unwinding process and, specifically, sets forth

---

[12] The Regents alleges, for example, "[u]nder the Management Services Agreement, Buttgenbach and 8minute could only obtain reimbursement of 'Management Costs' from [the joint venture], which is defined as 'all actual costs and expenses incurred' by Buttgenbach and 8minute for the performance of 'Management Services' that are 'reasonably and in good faith determine[d] [to] directly benefit[]' [the joint venture."

32

and controls the notices the parties are to give once this process commences. Indeed, the class B members' amended arbitration demand alleged in detail a multitude of provisions in the agreement controlling and leading to the "Designated Project Contribution Notice" about which the class B members complained in the arbitration and The Regents complains here.

Thus, the theory of equitable estoppel may be invoked to compel The Regents to arbitrate the claims it asserts in its first cause of action. We consider whether The Regents should, as an equitable matter, be compelled to arbitrate these and other claims *infra*.

### Second Cause of Action

The Regents second cause of action is titled "Cal. Gov. Code[,] § 12651(a)(2)—Creation of False Records." The operative allegations identify two categories of claims.

With respect to Buttgenbach and his development company, The Regents allege the materials they prepared and presented to The Regents during the negotiations prior to The Regents authorizing an investment in the joint venture "contained material falsehoods" and did so because Buttgenbach, at that time, "intended to steal his outside investors' interests." As we have discussed, this claim is essentially one of fraudulent inducement and arbitral under *Ericksen* and *Rosenthal*.

With respect to Buttgenbach, his development company, and the manager of the joint venture, The Regents first claims "the expense reimbursement spreadsheet" reflecting the allegedly improper reimbursement requests "materially misrepresented unauthorized costs and expenses as legitimate claims." The Regents secondly claim the "Designated Project Contribution Notice" "materially misrepresented the good faith determination of the necessary funding requirements for the [joint venture]

33

[p]rojects." For the reasons we have discussed, these claims are also squarely dependent on and/or inextricably intertwined with the operative joint venture and the management agreements, and The Regents may be compelled to arbitrate them on an equitable estoppel theory.

### Third Cause of Action

The Regents third cause of action is titled "Cal. Gov. Code[,] § 12651(a)(3)—Conspiracy to Violate CFCA." Like the allegations of the second cause action, the operative allegations of the third cause of action identify two categories of claims.

The first is asserted against Buttgenbach and his development company. The Regents allege they "conspired" to submit false claims and create false records in order "to induce the University" to approve an investment in the joint venture. For the reasons we have discussed, this category of claims is arbitral under *Ericksen* and *Rosenthal*.

The second category of claims is asserted against Buttgenbach, his development company, and the manager of the joint venture. The Regents allege they conspired to submit false claims and to create false records to (a) recoup "claims for expense reimbursements" and (b) to make a "fraudulent demand . . . with respect to the Designated Project Contribution Notice." For the reasons we have discussed, these claims are also dependent on and/or inextricably intertwined with the operative joint venture and management agreements, and The Regents may, on the basis of equitable estoppel, be compelled to arbitrate them.

### Fourth Cause of Action

The Regents fourth cause of action is titled "Cal. Gov. Code[,] § 12651(a)(7)—Avoidance of Obligation to Make Payments." This cause of action also identifies two categories of such claims. Both are asserted against

34

Buttgenbach, his development company, the joint venture, and the manager of the joint venture.

As to the first category, The Regents allege that the assertedly improper Designated Project Contribution Notice was part of a "scheme to prevent [the joint venture] from paying any return on the University's" investment. For the reasons we have discussed, this claim is squarely dependent on and/or inextricably intertwined with the operative joint venture agreement, and The Regents may be compelled to arbitrate it under an equitable estoppel theory.

As to the second category, The Regents allege a conspiracy to make false statements and create false records to "misrepresent" that the joint venture had a " 'liquidity crisis' " to "induce the University to authorize a restructuring of the financing and other interests in" the joint venture which "would reduce" the joint venture's "obligation to transmit funds" on "account of the University's $150 million investment." The general allegations of The Regents' complaint refer to two supposedly manufactured "liquidity crises"— the first in 2019 before or during the time The Regents engaged in negotiations about a potential investment, the second three months after The Regents authorized an investment in the joint venture. It is unclear which "liquidity crisis" is referenced in the fourth cause of action. But whether the joint venture faced a "liquidity crisis" requires a close examination of the financial obligations to, and financial obligations of, the joint venture— matters governed by the joint venture agreement. Accordingly, this claim, too, is inextricably intertwined with the responsibilities and obligations set forth in that agreement, and The Regents may, under an equitable estoppel theory, be compelled to arbitrate this category of claims, as well.

35

### *Fifth Cause of Action*

The Regents fifth cause of action is titled "Cal. Gov. Code[,] § 12651(a)(8)—Recovery from Inadvertent Beneficiary." This cause of action is asserted against Buttgenbach's development company, the joint venture, and the two class A members (8minutenergy US Investor, LLC and 8minutenergy US Investor 2, LLC).

The Regents does not make any additional substantive allegations in this cause of action. Rather, it alleges that these entities benefited from the allegedly false claims, false records, and conspiracy to produce them described in the preceding causes of action. Accordingly, for the reasons we have discussed, The Regents may be compelled to arbitrate these claims.

### *The Equities*

Having determined that the claims The Regents asserts are based on and/or are inextricably intertwined with the joint venture and management agreements, we turn to whether The Regents should be estopped from disavowing the arbitration provisions in those agreements.

Given the particular and unique circumstances of this case, it is our "considered view," that The Regents "cannot assert that [it is] entitled to recover according to the terms of [these] agreement[s], while simultaneously repudiating the arbitration clause[s] contained therein." (*JSM Tuscany, supra,* 193 Cal.App.4th at p. 1241; see *Washington Mutual Finance Group, LLC v. Bailey* (5th Cir.2004) 364 F.3d 260, 268 ["Restated, the doctrine of estoppel prevents a party from 'having it both ways.' "].)

In structuring its investment, The Regents sought to barricade itself behind limited partnerships with Upper Bay and Upper Bay's funneling the funds through its own investment vehicle, MDS Capital. While The Regents characterize itself as being two steps removed from the joint venture, MDS

36

Capital is a mere affiliate of and wholly controlled by Upper Bay, and the two are referred to without distinction as "Upper Bay" in the joint venture agreement, which The Regents reviewed. [REDACTED.] This arrangement, according to The Regents, left to Upper Bay, and only Upper Bay, the responsibility for negotiating, performing, and enforcing the terms of the joint venture and management agreements.

Yet, The Regents has now deliberately breached the very barricade it constructed for itself and taken on the role it purportedly left to Upper Bay with respect to those agreements, and it has done so with full knowledge of the terms of those agreements.[13] No equities weigh in favor of allowing The Regents to selectively enforce the provisions of those agreements it wants to embrace and disavow the provisions to arbitrate. Nor would requiring The Regents to arbitrate the contract based and/or entwined claims it has advanced in this case have any adverse effect on any public interest or policy.[14] (See *Medina, supra,* 112 Cal.App.4th at pp. 868–869.)

The Regents maintains requiring it to arbitrate would frustrate two "strong public polic[ies]"—a litigant's right to sue in court and having "the government's dealings out in the open." The first of these policies, of course,

---

[13] Even if The Regents was not aware of each detailed term of the agreements when it authorized the investment in the joint venture, as Lee claimed at the arbitration, he acknowledged The Regents' investment team had every opportunity to review the agreements and also conceded that had The Regents wanted changes made, it would have been "listened to."

[14] This is not, for example, an "enforcement action" by a public entity pursuant to its police powers that relies *not* on the provisions of any contract, but on the substantive provisions of regulatory law. (See, e.g., *People v. Maplebear, Inc.* (2022) 81 Cal.App.5th 923, 926–927; *id.* at p. 935 [state not bound by arbitration provision in defendant's agreement with employees; "FAA is not concerned with the ability of the State of California to prosecute violations of the Labor Code and to seek civil penalties"].)

applies in any case subject to arbitration under any recognized theory and, perforce, does not overcome the propriety of arbitration. As for the second policy, the extent to which an arbitrated dispute is made public depends on the agreements made during the arbitration as to how it is conducted. However, more significantly for the purposes of this case, *The Regents* immediately moved in the trial court to seal a substantial portion of the record filed in connection with the motion to compel arbitration. Furthermore, an extensive protective order was put in place in the arbitration, with no indication in the record that The Regents had any objection whatsoever to that order. Thus, The Regents' claim that arbitration would implicate the strong policy favoring government transparency has a decidedly hollow ring.[15]

### Non-Signatory Defendants

In the final two paragraphs of its respondent's brief, The Regents asserts Buttgenbach, "8MESolar", and "8ME US Solar Holdings" are "on even

---

[15] In the trial court (but not on appeal), The Regents maintained it would be unfair to require it to arbitrate because the arbitrator rejected like claims brought by the class B members and, according to The Regents, ruled it is bound by these adverse rulings. While the arbitrator included in the interim award comments to the effect The Regents was not a disinterested third party—a view that finds support in the record (for example, a member of The Regents' investment team was an "observer" of joint venture governing board meetings, The Regents facilitated and participated in efforts to settle the arbitration, and investment team witnesses prepared with the assistance of both university counsel and class B's counsel, and class B's counsel asserted a "common interest" privilege not to divulge what was said during those preparation sessions)—the arbitrator did not rule, nor was she asked to rule, whether The Regents' claims are barred by res judicata or collateral estoppel. The Regents was not a *party* to the arbitration and it cannot be bound by any rulings or commentary in the interim award absent further proceedings and a determination based on a careful analysis of the law governing preclusion.

weaker ground in seeking to compel arbitration, because they . . . are not parties to the arbitration agreements at issue." This is not an argument The Regents ever advanced in the trial court.

In support, The Regents point, again, to Buttgenbach's assertion during the arbitration proceedings that the arbitration provision in the joint venture agreement could not be enforced against him " 'because he is not a party to that agreement and none of the circumstances under which a nonsignatory to an arbitration provision can be compelled to arbitrate exist here.' " We fail to see how this statement has any bearing on the situation now at hand. Defendants have not sought to compel The Regents to arbitrate as a signatory; rather, they have invoked two of the well recognized theories for compelling a *nonsignatory* to arbitrate. And for all the reasons we have discussed, even though *not* a signatory, The Regents can be compelled to arbitrate the claims it has asserted in this case under the theory of equitable estoppel.[16]

The Regents also appear to have overlooked our Supreme Court's decision in *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 409 (*Dryer*), in which the court, having concluded the Rams could compel Dryer to arbitrate under an arbitration provision in the collective bargaining agreement between the player's union and the NFL, next considered whether the individual defendants could also compel arbitration even though they were not, themselves, parties to the agreement. The court answered the question in the affirmative, pointing out these defendants were being sued in their capacities as " 'the owners, operators, managing agents, and in control . . . of

---

[16] Whether any of the theories pertaining to nonsignatories might have applied to Buttgenbach and his other solar energy entities at the time of the arbitration was not an issue that was ever fully briefed, heard, or decided by the arbitrator.

a Professional Football Team,' " namely the Rams. (*Id.* at p. 418.) "Moreover . . . each cause of action alleged in the complaint is included in and governed by the contract." (*Ibid.*) As the high court observed, a ruling compelling arbitration only as to the team and not the associated individual defendants would have yielded "bizarre results." (*Ibid.*)

Here, The Regents has similarly and variously alleged that Buttgenbach "both personally and through corporate entities he controlled" submitted false claims "to induce" The Regents to invest in the joint venture, that Buttgenbach "operates under the '8minute Energy' or '8minute' brands," that Buttgenbach "engineered" supposed financial crises of the joint venture, that Buttgenbach's "control over development and sales timelines" meant he "could create the need for additional liquidity at his discretion, while delaying project sales," and that Buttgenbach "both personally and through the corporations that he controls" violated the California False Claims Act." Indeed, The Regents has alleged that Buttgenbach either masterminded or performed all of the problems that ultimately resulted in the joint venture's failure.

Thus, Buttgenbach has been sued, along with his "8minute brands," in his/their capacities as owner/controller of the "8minute brands" and controller of the joint venture, specifically. Moreover, as we have discussed, the claims The Regents has asserted are dependent upon and/or inextricably intertwined with the terms of the joint venture agreement. Consequently, these nonsignatory defendants can avail themselves of the arbitration provision in that agreement. (See *Dryer, supra,* 40 Cal.3d at p. 418; see also *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1319 [plaintiffs' "attempt to avoid arbitration" on ground some defendants were not signatories "require[d] only cursory discussion;" that defendants "joined in

40

the motion to compel arbitration and on appeal [sought] reversal of the order denying arbitration" "effectively waived any objection they might have asserted to arbitration of the dispute"], abrogated on other grounds as stated *in Sanquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 250.)

## DISPOSITION

The order denying defendants' motion to compel arbitration is RE-VERSED and the matter is remanded to the trial court for further proceedings consistent with this opinion.  Respondents to recover costs on appeal.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Swope, J.*

**Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A164833, *Regents of University of California v. Buttgenbach et al*